# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

JEREMIAH IRA WILLIAMS,

Defendant and Appellant.

S262229

Fourth Appellate District, Division One
D074098

San Diego County Superior Court
SCD268493

August 29, 2024

Justice Jenkins authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, and Smith concurred.*

Justice Liu filed a dissenting opinion.

---

* Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. WILLIAMS

S262229


Opinion of the Court by Jenkins, J.


Under California's youth offender parole statute (Pen. Code,[1] § 3051), certain persons incarcerated for crimes committed at a young age may be eligible for early release on parole. One factor relevant to the decision to release is the offender's amenability to rehabilitation based on recognized attributes of youth. Section 3051, however, expressly excludes certain groups from its purview, including defendants convicted of forcible sexual offenses and sentenced under the One Strike law (§ 667.61). (§ 3051, subd. (h) (§ 3051(h)).) By contrast, those convicted of murder (aside from young adults convicted of special circumstance murder) are not categorically excluded. (*People v. Hardin* (2024) 15 Cal.5th 834, 843 (*Hardin*).)

Defendant Jeremiah Ira Williams was sentenced to an indeterminate prison term of 100 years to life plus 86 years two months for One Strike offenses he committed when he was 24 years old. Defendant contends that by categorically excluding young adults convicted of One Strike offenses, but not young adults convicted of murder without special circumstance, from the possibility of early release, section 3051 violates the equal protection guarantee of the federal Constitution. This unequal treatment, he asserts, is irrational based, in part, on the high court's recognition in the Eighth Amendment context that

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

"defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." (*Graham v. Florida* (2010) 560 U.S. 48, 69 (*Graham*).)

The Court of Appeal rejected defendant's equal protection challenge, finding a rational basis for the differential treatment. For reasons that follow, we affirm the Court of Appeal's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Over two days in the summer of 2016, then 24-year-old defendant committed numerous sexual offenses against two female victims in two separate incidents in San Diego.

On the evening of August 13, Doe 1 returned home after spending the day with friends. As she headed from the garage to her apartment, a man approached her and asked if she needed help carrying the items in her hands. She replied, "No." But he followed her, claiming he was looking for a friend's apartment. As Doe 1 unlocked her front door, the man rushed toward her, knocked her down, and held a gun to her head while demanding money. Doe 1 gave him a necklace, her wallet, and cell phone. He then forced her into her apartment, where he choked her and demanded money and other valuables.

The man punched Doe 1 in the face, causing her to fall and fracture her face. He then removed her pants and dragged her to the bedroom, where he penetrated her vagina with his penis, digitally penetrated her vagina, and forced her to orally copulate him. Thereafter, he forced Doe 1 into her shower where he wiped her bleeding face and vagina with a washcloth. At some point, the man closed the shower curtain and left the apartment. Doe 1 remained in the shower for about 20 minutes, not knowing

if the man was still inside her apartment. She then got out of the shower, and went to a neighbors' apartment. She told her neighbors about the attack, and they drove her to the hospital. Doe 1 suffered severe physical and psychological trauma.

During the ensuing police investigation, Doe 1 viewed individuals at a physical lineup but was unable to identify defendant. She subsequently identified him at the preliminary hearing as her assailant. Investigators were also able to match defendant's DNA to a sample recovered from Doe 1's bedroom comforter.

On August 14, the day after Doe 1 was attacked, Doe 2 was working as a prostitute at a San Diego motel. She had previously posted an "ad" on the Internet notifying potential "clients" of her general location. A man contacted Doe 2 and said he had $200 and wanted an hour of her time. They agreed to meet that day at Doe 2's motel room. When he arrived later that day, he entered Doe 2's motel room and immediately asked to use the restroom. When he came out of the bathroom, he threatened her, asking if she "wanted to die." At some point, he grabbed her neck and choked her repeatedly. Doe 2 lost consciousness. When she awoke, she was bent over on the side of the bed and felt the man's penis inside her anus.

She tried to fight the man off, but he continued to choke her. At one point during the assault, he pulled out a handgun and struck Doe 2 on the head with it. She broke free and ran to the window, which she opened and then screamed for help. The man grabbed some of his belongings and fled the scene. Doe 2 climbed out the window and called an acquaintance, Henry C., for help. Henry C. picked her up from the motel and drove her back to her apartment. She initially declined to go to the

hospital because she believed she would get in "trouble" for engaging in prostitution. However, two days after the attack, she went with Henry C. to the hospital, where she received treatment and spoke to a police officer about the attack.

Doe 2 later identified defendant in a photographic lineup as her attacker. The DNA of blood samples taken from defendant's handgun and from his chest matched Doe 2's DNA. A jewelry box missing from Doe 1's apartment was found in a backpack left in Doe 2's motel room.

After concluding its investigation of the assaults against Doe 1 and Doe 2, the prosecution filed a 13-count information charging defendant for offenses perpetrated against both victims. The information alleged counts for robbery (§ 211; count 1); making criminal threats (§ 422; counts 2, 8, 9, 11); forcible rape (§ 261, subd. (a)(2); counts 3, 6); forcible penetration (§ 289, subd. (a); count 4); forcible oral copulation (§ 288a, subd. (c)(2)(A); count 5); burglary (§ 459; count 7); sodomy by use of force (§ 286, subd. (c)(2)(A); count 10); assault with a firearm (§ 245, subd. (a)(2); count 12); and false imprisonment by violence, menace, fraud, and deceit (§§ 236, 237, subd (a); count 13). Counts 1 through 8 were alleged to have been committed against Doe 1, and counts 9 through 13 were alleged to have been committed against Doe 2.

After presentation of evidence and jury deliberations, the jury found defendant guilty as charged on counts 1 to 9 and 11 to 13, and it found him guilty as to count 10 on the lesser included offenses of battery and assault (§§ 240, 242). It also found that he: (1) personally used a firearm as to counts 1, 3, 4, 5, and 6 (§ 12022.53, subd. (b)), and personally used a firearm as to counts 2, 7, and 11 (§ 12022.5, subd. (a)); (2) kidnapped Doe

1, committed the offenses against her in the commission of a burglary, and inflicted great bodily injury on her as to counts 3, 4, 5, and 6 (§§ 667.61, subds. (a), (c), (d), & (e) & 667.5); and (3) committed the burglary in count 7 with another person present other than an accomplice (§ 667.5, subd. (c)(21)).  The jury did not find true the multiple victim allegations attached to counts 3 through 6.  When he committed the offenses against Doe 1 and Doe 2, defendant was on felony probation for a 2013 offense of inflicting corporal injury on an intimate partner.  (§ 273.5, subd. (a).)

Given the nature of counts 3, 4, 5, and 6 as One Strike offenses under section 667.61, the trial court sentenced defendant to four consecutive terms of 25 years to life for each of those counts.  It imposed an additional 10 years pursuant to section 12022.53, subdivision (b) and 5 years pursuant to section 12022.8, for a total of 15 additional years on counts 3 through 6.  With the remaining determinate terms, defendant's total sentence was 100 years to life plus 86 years two months.  The court also imposed fines and fees, including restitution to the two victims.

Defendant appealed, arguing in part that section 3051's categorical exclusion of One Strike offenders, which rendered him ineligible for a youth offender parole hearing, violated his equal protection rights under the Fourteenth Amendment to the federal Constitution.  The Court of Appeal rejected defendant's claim, finding that the "threat of recidivism by violent sexual offenders" provides a rational basis for the Legislature to exclude One Strike offenders from section 3051's early release provisions.  At least one Court of Appeal has reached the opposite conclusion, sustaining an equal protection challenge to

section 3051's exclusion of One Strike offenders. (See *People v. Edwards* (2019) 34 Cal.App.5th 183.)

We granted review to resolve this split of authority.

## DISCUSSION

### A. Section 3051

Section 3051 offers youth offenders committed for long prison terms an opportunity for early release on parole. It requires the Board of Parole Hearings (Board) to conduct a youth offender parole eligibility hearing to determine if, based on certain criteria involving the "[c]ontrolling offense,"[2] the offender is eligible for parole during the 15th, 20th, or 25th year of incarceration. (§ 3051, subd. (b)(1)–(4).) The hearing must "provide for a meaningful opportunity to obtain release" (*id.*, subd. (e)), and includes an assessment of the offender's "growth and maturity" that "take[s] into consideration the diminished culpability of youth as compared to that of adults [and] the hallmark features of youth." (*Id.*, subd. (f)(1); see 15 Cal. Code Regs. §§ 2440–2448; § 4801, subd. (c).)

As we recently explained in *Hardin, supra*, 15 Cal.5th at pages 843–845, the Legislature initially crafted this early parole eligibility mechanism for youth offenders in response to *Graham, supra*, 560 U.S. 48, *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). (Stats. 2013, ch. 312, § 1; see generally *People v. Franklin* (2016) 63 Cal.4th 261, 277 (*Franklin*).) In *Graham*, the high court held that the Eighth Amendment protection

---

[2] A "[c]ontrolling offense" is defined as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

against cruel and unusual punishment prohibits life without the possibility of parole (LWOP) sentences for juveniles who commit nonhomicide crimes before the age of 18. (*Graham*, *supra*, 560 U.S. at p. 82.) In reaching this conclusion, the court recognized that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and that homicide offenses differ "in a moral sense" from nonhomicide offenses in terms of " 'their "severity and irrevocability." ' " (*Id.* at p. 69.) The high court concluded that although a state need not "guarantee eventual freedom" to such juvenile offenders, it must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Id.* at p. 75.)

Two years later, in *Miller*, a homicide case involving two 14-year-old defendants, the high court held "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Miller*, *supra*, 567 U.S. at p. 474.) Although rejecting a categorical bar on LWOP sentences for juveniles convicted of homicide offenses, the court equated such severe sentences for juveniles to the death penalty and reaffirmed the principle that individualized sentencing when meting out a state's harshest penalties is not only paramount but is compelled by the Eighth Amendment. (*Miller*, at pp. 474–475.) Accordingly, before imposing an LWOP sentence on a juvenile convicted of a homicide offense, "a judge or jury must have the opportunity to consider mitigating circumstances," including the juvenile's "chronological age and its hallmark features" such as "immaturity, impetuosity, and failure to appreciate risks and consequences." (*Id.* at pp. 477, 489.)

Within months after the high court's *Miller* decision, we considered whether under *Graham* a 110-year-to-life sentence imposed on a 16-year-old defendant for nonhomicide offenses violated the Eighth Amendment's prohibition against cruel and unusual punishment. (*Caballero*, *supra*, 55 Cal.4th at p. 265.) We observed that the juvenile's lengthy "term-of-years" sentence "amount[ed] to the functional equivalent of a life without parole sentence" (*id*. at 268), and we held that it constituted cruel and unusual punishment. We therefore reversed the defendant's sentence and directed the sentencing court to "consider all mitigating circumstances attendant in the juvenile's crime and life," including the juvenile's chronological age and physical and mental maturity. (*Id*. at pp. 268–269.)

At the same time, "we urge[d] the Legislature to enact legislation establishing a parole eligibility mechanism" that would afford defendants who are effectively serving an LWOP sentence for nonhomicide offenses committed as a juvenile "with the opportunity to obtain release on a showing of rehabilitation and maturity" consistent with the high court's Eighth Amendment jurisprudence. (*Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.) The Legislature responded to our entreaty by enacting section 3051 in 2013. (Stats. 2013, ch. 312, § 4; see *Franklin*, *supra*, 63 Cal.4th at p. 277 [Legislature sought to "bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*"].) The enactment expressly declared the "intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats. 2013, ch. 312, § 1.)

As originally enacted, section 3051 provided youth offender parole hearings for offenders who were incarcerated for crimes committed as juveniles under 18 years old. (Former

§ 3051, subd. (a)(1), added by Stats. 2013, ch. 312, § 4.) This ceiling tracked the age limitation the high court had imposed in juvenile sentencing cases. (See *Graham*, *supra*, 560 U.S. at p. 74, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 574 (*Roper*) [" '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood' "]; *Roper*, at p. 574 [18 years is "the age at which the line for death eligibility ought to rest"].)

Although the high court has not extended these parole opportunities to youthful offenders 18 years and older as a matter of constitutional law (see *United States v. Gates* (6th Cir. 2022) 48 F.4th 463, 476), our Legislature has done so twice, as a matter of statutory law, in amendments to section 3051. In 2015, it raised the age of eligibility for youth offender parole hearings to most offenders under 23 years old (Stats. 2015, ch. 471, § 1), based on then " '[r]ecent neurological research show[ing] that cognitive brain development continues well beyond age 18 and into early adulthood.' " (Assem. Com. on Public Safety, Report on Sen. Bill No. 261 (2015–2016 Reg. Sess.), as amended June 1, 2015, p. 2; see *ibid.* [" 'For boys and young men in particular, this process [of development] continues into the mid-20s' "].) The Legislature raised the age limit again in 2017 to include most offenders 25 years old or younger. (Stats. 2017, ch. 675, § 1.)

Section 3051 "reflects the Legislature's judgment that 25 years is the maximum amount of time that [most youth] offender[s] may serve before becoming eligible for parole." (*Franklin*, *supra*, 63 Cal.4th at p. 278; see *id.* at p. 281 [§ 3051 "effectively reforms the parole eligibility date of a [youth] offender's original sentence"].) By superseding the statutorily mandated sentences of most prisoners who committed their

controlling offense before the age of 26, section 3051 "changed the manner in which the [youth] offender's original sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole." (*Franklin,* at p. 278.)

Here, defendant was sentenced to an indeterminate term of 100 years to life plus a consecutive determinate term of 86 years and two months (see §§ 669, subd. (a); 3046, subd. (b)), making him eligible for parole after serving 186 years of imprisonment, a term greatly exceeding his life expectancy. If eligible under section 3051, defendant could seek parole after 25 years of incarceration. (See § 3051, subd. (b)(3).) However, because he was sentenced under the One Strike law, he is categorically excluded from seeking early parole under section 3051(h), while some young adult offenders convicted of murder remain eligible for parole after serving 25 years. Defendant maintains this unequal treatment of the two types of offenders has no rational basis and therefore violates the Fourteenth Amendment's guarantee of equal protection.[3]

Subdivision (h) of section 3051 categorically excludes certain persons from consideration for youth offender parole hearings. Those ineligible for early parole include offenders who, like defendant, are sentenced for felony sex crimes under the One Strike law (§ 667.61); offenders who are sentenced under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12); offenders who are sentenced to life without parole for an offense

---

[3]     Defendant did not raise a challenge to his sentence as violating the Eighth Amendment's prohibition against cruel and unusual punishment.

committed after turning 18 years old;[4] and offenders who, "subsequent to attaining 26 years of age, commit[] an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison." (§ 3051(h).) Although the life without parole exclusion applies to persons convicted of special circumstance murder committed after the age of 18, other individuals who are convicted of murder are not categorically excluded; neither are those who are sentenced under the habitual sexual offender act (§ 667.71). The statute itself does not explicitly describe the underlying purpose for section 3051's enumerated exclusions (§ 3051(h)). Although the Legislature has amended section 3051 several times, it has maintained the One Strike exclusion since the section's enactment in 2013. (See *Hardin*, *supra*, 15 Cal.5th at p. 846.)

Although "parole is a form of punishment accruing directly from the underlying conviction" (*People v. Nuckles* (2013) 56 Cal.4th 601, 609), to a youth offender seeking early release under section 3051, the prospect of parole serves as a form of dispensation allowing the offender to demonstrate the requisite maturity and rehabilitation to return to society after years of incarceration. Specifically, section 3051 offers youth offenders "a meaningful opportunity" for release (§ 3051, subd. (e)), requiring the Board to give "great weight to the diminished

---

[4]    In 2017, the Legislature amended section 3051 to allow youth offender hearings for juveniles (those under 18 years of age) — but not young adults (those 18 to 25 years of age) — sentenced to LWOP. (See *People v. Acosta* (2021) 60 Cal.App.5th 769, 777 [amendment sought to bring California into compliance with *Miller*'s prohibition of mandatory LWOP sentences on juvenile offenders, which was made retroactive].)

culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c); see § 3051, subd. (e); see also 15 Cal. Code Regs. §§ 2440–2448 [Regulations on "Parole Consideration Hearings for Youth Offenders"]; see *ante*, at p. 6.)

Because section 3051 "create[s] a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established" (Stats. 2013, ch. 312, § 1), a denial of parole after a section 3051 proceeding reflects a determination that, among other things, the youthful offender has not sufficiently matured and rehabilitated to warrant release. (See *Franklin*, *supra*, 63 Cal.4th at p. 284 [Board must determine if youth offender is " 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' "].) It follows that the Legislature's decision to categorically exclude a class of youth offenders from such parole reflects, in part, its judgment that the excluded offenders do not have "greater prospects for reform" (*Miller*, *supra*, 567 U.S. at p. 471) and are, therefore, not amenable for early release.

We bear in mind, however, that while the Legislature's primary purpose in expanding youth offender parole eligibility was to offer certain young adult offenders "the opportunity to obtain release based on demonstrated growth and rehabilitation," the Legislature also had "other, sometimes competing, concerns, including concerns about culpability and the appropriate level of punishment for certain very serious crimes" that informed the statutory framework. (*Hardin*, *supra*, 15 Cal.5th at p. 854.) Here, we consider the exclusion of youth offenders sentenced for a One Strike offense, which may similarly reflect a range of "penological considerations,

including rehabilitative and retributive purposes." (*Hardin,* at p. 857.)

With this understanding of the nature of parole eligibility under section 3051, we now address the One Strike law and its amendments and explain how young adults sentenced under that law are precluded from seeking relief under section 3051.

## B. One Strike Law and Its Amendments

The One Strike law provides an alternative, harsher sentencing scheme for enumerated forcible sex offenses — including rape, rape or sexual penetration in concert, lewd or lascivious acts, forcible sexual penetration, sodomy, oral copulation, or continuous sexual abuse of a child — that are committed under specified circumstances. (§ 667.61, as amended by Prop. 83, § 12, as approved by voters, Gen. Elec. (Nov. 7, 2006), eff. Nov. 8, 2006; see *People v. Acosta* (2002) 29 Cal.4th 105, 118 (*Acosta*); *People v. Anderson* (2009) 47 Cal.4th 92, 102, 108 ["a One Strike allegation exposes a defendant to greater punishment than would be authorized by a verdict on the offense alone"].)

Enacted in 1994, the One Strike law sought "to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction . . . where the nature or method of the sex offense 'place[d] the victim in a position of *elevated vulnerability.*' " (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1296, quoting Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 26 (1993–1994 1st Ex. Sess.) as amended May 25, 1994, pp. 2–3.) " 'Violent sexual predators should not be given the opportunity to repeat their crimes. Since most rapists and child molesters cannot be cured of the aberrant compulsions, they should not be eligible for probation under any

circumstances, and their punishment must be separation from society for life without the possibility of parole.' " (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 26 (1993–1994 1st Ex. Sess.) as introduced Feb. 2, 1994; see *People v. Wutzke* (2002) 28 Cal.4th 923, 929–930 (*Wutzke*).) To implement this purpose, the One Strike law authorizes lengthy sentences for both "recidivist sexual offenders *and* first time offenders who commit certain sexual offenses under aggravated circumstances." (*People v. Hammer* (2003) 30 Cal.4th 756, 768 (*Hammer*).)

The One Strike law applies if a trier of fact, upon convicting a defendant of a triggering offense, also finds true at least one circumstance specified in subdivisions (d) or (e) of section 667.61. The specified circumstances, other than prior convictions (§ 667.61, subd. (d)(1)), relate to the manner in which the defendant committed the present offense. (See, e.g., § 667.61, subds. (d)(2)–(d)(7) & (e)(1)–(e)(7); see *Wutzke*, *supra*, 28 Cal.4th at p. 930 ["Many of these circumstances reflect the use of violent or predatory means that increase the victim's 'vulnerability' "]; see also *Acosta*, *supra,* 29 Cal.4th at p. 127.)

In general, the length of a One Strike term depends on the number and nature of applicable aggravating circumstances found by the trier of fact. (See § 661.67, subds. (a), (b), (j), (*l*), (m).) For instance, a defendant who commits a particular offense "under one or more of the circumstances specified in subdivision (d)" of section 667.61 or "under two or more of the circumstances specified in subdivision (e)" of that section, is sentenced to 25 years to life. (§ 667.61, subd. (a); see *Acosta*, *supra*, 29 Cal.4th at p. 111.) Alternatively, a defendant who commits a particular offense under only "one of the circumstances specified in subdivision (e)" is sentenced to 15

years to life. (§ 667.61, subd. (b); see *Acosta*, at p. 111.)[5] Through the years, the electorate and the Legislature — concerned about the high rate of recidivism among sex offenders — have increased the penalties and expanded the scope of those eligible to be sentenced under the One Strike law.

For example, in 2006, the electorate passed Proposition 83, which amended, among other statutes, the Sexually Violent Predator Act (SVPA) and the One Strike law.[6] (Prop. 83, § 12, *supra*.) The initiative was titled "The Sexual Predator Punishment and Control Act: Jessica's Law" (Proposition 83 or Jessica's Law). Its Findings and Declarations explained: "Sex offenders have very high recidivism rates. . . . [They] are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society. More than two-thirds of the victims of rape and sexual assault are under the age of 18. Sex offenders have a dramatically higher recidivism rate for their crimes than any other type of violent

---

[5] Originally, the One Strike law provided that the defendant "shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for" 15 or 25 years. As we shall discuss, the statute now also authorizes LWOP sentences. (§ 667.61, subds. (j)(1), (*l*); Stats. 2010, ch. 219, § 6.)

[6] Months before the initiative's passage, the Governor signed the Sex Offender Punishment, Control, and Containment Act of 2006 (Sen. Bill No. 1128 (2005–2006 Reg. Sess.)), as urgency legislation that took immediate effect. (See *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1280.) Senate Bill No. 1128 and Proposition 83 made similar changes to section 667.61, and do not differ in ways that are relevant to the issue at hand.

felon." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127 (Voter Information Guide on Prop. 83).)

Regarding the One Strike law, Proposition 83 expanded its scope by adding the offense of continuous sexual abuse of a child (§ 288.5) to the list of offenses eligible for One Strike sentencing (§ 667.61, subd. (c)(9), as amended by Prop. 83, § 12, *supra*). It also added two new circumstances to subdivisions (d) and (e), respectively, to enhance a defendant's sentence under the One Strike law. (Former § 667.61, subds. (d)(5) [defendant committed violation of §§ 264.1, 286, subd. (d), or former § 288a, subd. (d), and in committing that offense, also committed any act described in (2), (3), or (4) of this subdivision]; (e)(8) [defendant committed violation of §§ 264.1, 286, subd. (d), or former § 288a, subd. (d), and in committing that offense, also committed any act described in (1), (2), (3), (4), (6) or (7) of this subdivision].)

Several years after the voters' passage of Jessica's Law, the Legislature passed the "Chelsea King Child Predator Prevention Act of 2010" (Chelsea's Law), making more significant changes to the One Strike law and other statutes governing sex offenses. (Stats. 2010, ch. 219, §§ 1, 16; see *People v. Soto* (2011) 51 Cal.4th 229, 237, fn. 4.) Chelsea's Law greatly enhanced One Strike sentences for all nine triggering offenses, except a lewd and lascivious act on a child (§ 288, subd. (a)), based on the victim's age. (See § 667.61, subd. (j)(1) & (2).) Accordingly, under Chelsea's Law, if the victim was a minor under 14 years of age at the time of the offense, the perpetrator's sentence would increase to either 25 years to life or LWOP depending on the nature and number of the aggravating circumstances and the defendant's age. (Compare § 667.61, subd. (j)(1) & (2) with § 667.61, subds. (a), (b); see *People v. Betts*

(2020) 55 Cal.App.5th 294, 301 [§ 667.61 is a "multitiered sentencing scheme"].) If the victim was a minor 14 years *or older*, the defendant likewise was subject to 25 years to life or LWOP for certain types of offenses. (§ 667.61, subds. (*l*), (m), (n).) In addition to these increased sentences, Chelsea's Law added two new circumstances to subdivision (d)'s list of aggravating factors. (§ 667.61, subd. (d)(6) [personal infliction of "great bodily injury"], (d)(7) [personal infliction of "bodily harm" against a minor under age 14].)

Observing that "current California law does not acknowledge or adjust for the true nature of the sexual violent predator that attacks children," the legislative history of Chelsea's Law explained that One Strike offenders who commit "the most serious and heinous sex crimes against children are not able to be rehabilitated" and that these crimes "are a red flag that the perpetrator is capable of much, much worse." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844 (2009–2010 Reg. Sess.), as amended Apr. 13, 2010, pp. 13; see Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1844 (2009–2010 Reg. Sess.), as amended June 2, 2010, p. 17 [offenders should be "locked up for life without the possibility of parole"].) Significantly, the Legislature recognized that Chelsea's Law would "punish specified sex offenders more severely than individuals convicted of first-degree, premeditated murder." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844, *supra*, p. 14.)

## C. Facial or As-Applied Challenge

As a threshold matter, we address whether defendant is contesting the constitutionality of section 3051 as applied or on its face. Consistent with our grant of review, defendant

challenges section 3051 insofar as it excludes *young adults* sentenced under the One Strike law.  In this regard, he appears to be making an as-applied challenge, which seeks "relief from a specific application of a facially valid statute or ordinance to an individual *or class of individuals* who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied."  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*), italics added.)

However, defendant's counsel asserted at oral argument that defendant is making a facial challenge to section 3051.  "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe, supra,* 9 Cal.4th at p. 1084.)  To succeed on such a challenge, and thus void the statute as a whole, it is not enough to show " ' "that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . .   Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' "  (*Ibid.*; see *People v. Martinez* (2023) 15 Cal.5th 326, 338 ["To prevail on a facial challenge, litigants must show that the challenged rule creates constitutional problems in 'at least " 'the generality' " [citation] or "vast majority" ' of cases"].)

Ultimately, even if defendant is making a facial claim in addition to an as-applied claim, our resolution of the latter may dispose of the former.  If defendant cannot demonstrate that the law is unconstitutional as applied to him and others similarly situated, he has necessarily failed to demonstrate that the law is unconstitutional on its face.  (Cf. *Fusaro v. Howard* (4th Cir.

2021) 19 F.4th 357, 373–374; *United States v. Decastro* (2d Cir. 2012) 682 F.3d 160, 163; *Harris v. Mexican Specialty Foods, Inc.* (11th Cir. 2009) 564 F.3d 1301, 1313 ["Th[e] mere possibility of a constitutional application is enough to defeat a facial challenge to [a] statute"].)

Because consideration of defendant's claim as a facial or as-applied challenge does not determine the outcome here, we proceed to the substance of defendant's equal protection claim.

### D. The Applicable Equal Protection Framework

Defendant asserts that section 3051's exclusion of young adults sentenced under the One Strike law violates equal protection. He maintains that there is neither a rational basis nor a compelling state interest for excluding young adults sentenced under the One Strike law but not excluding young adults convicted of murder without special circumstance from youth offender parole hearings provided by section 3051. In support of his claim, he leverages the high court's pronouncement made in the context of an Eighth Amendment cruel and unusual punishment challenge that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." (*Graham*, *supra*, 560 U.S. at p. 69.) Defendant observes that because he was convicted of sexual offenses and sentenced under the One Strike law, he is categorically ineligible for a youth offender parole hearing. (§ 3051(h).) Had he been convicted of murder instead of One Strike sexual offenses, and assuming no other exclusions applied, he would have been eligible for such a hearing after 25 years of incarceration. This unequal treatment, defendant

asserts, is in direct tension with the high court's statement in *Graham*.

The Attorney General counters that a plausible basis for a legislative classification is sufficient to overcome an equal protection challenge and that the Legislature could rationally exclude One Strike offenders from early release under section 3051 based on a combination of factors:  the increased risk of recidivism that One Strike offenders pose and the aggravated nature of their offenses.  (See *Hammer*, *supra*, 30 Cal.4th at p. 768.)  These concerns, the Attorney General asserts, provide at least a "plausible" basis for the disparity in treatment, " ' "the wisdom, fairness or logic" ' " of which a court "may not second-guess." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).)  Because these rationales plausibly support the Legislature's exclusion of One Strike offenders from the youth offender parole statute, the Attorney General argues that defendant's equal protection challenge to section 3051(h) must fail.

Under the Equal Protection clause of the Fourteenth Amendment to the federal Constitution, no state may "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend.)  "[T]he requirement of equal protection ensures that the government does not treat a group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).)  "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." (*Baxtrom v. Herold* (1966) 383 U.S. 107, 111.)  "Unlike other provisions of the Constitution, the Equal Protection Clause confers no substantive rights and creates no substantive

liberties. The function of the Equal Protection Clause, rather, is simply to measure the validity of classifications created by state laws." (*San Antonio Indep. School Dist. v. Rodriguez* (1973) 411 U.S. 1, 59 (conc. opn. of Stewart, J.) (*Rodriguez*), fn. omitted.)

In resolving an equal protection challenge, we apply different levels of scrutiny depending on the type of classification involved. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 (*Wilkinson*).) " 'At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose.' " (*Ibid.*) If the unequal treatment involves a suspect class or fundamental right, then we apply strict scrutiny and " ' "*the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." [Citation.]' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.) "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." (*City of Cleburne, Tex. v. Cleburne Living Center* (1985) 473 U.S. 432, 440.) The question we must answer is "whether a statutory distinction is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection." (*Chatman, supra*, 4 Cal.5th at p. 289.)

Defendant does not contend that offenders sentenced under the One Strike law constitute a suspect class; nor does the right to early release on parole involve a fundamental constitutional right. (See *Jackson v. Jamrog* (6th Cir. 2005) 411 F.3d 615, 619 ["there is no fundamental right to parole under the federal Constitution"].) Nevertheless, defendant asserts that strict scrutiny applies here because the challenged law

"determines the length of incarceration" and directly impacts "the loss of personal liberty," which is a "fundamental interest." He relies, in part, on our statement in *People v. Olivas* (1976) 17 Cal.3d 236, 251 (*Olivas*) that "personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions."

We reject defendant's argument for applying strict scrutiny to the classification at issue for the same reasons we rejected a similar argument in *Wilkinson*. There, the defendant made an equal protection challenge to the statutory scheme governing the offense of battery on a custodial officer (see former §§ 243, 243.1), claiming "it allows the 'lesser' offense of battery without injury to be punished more severely than the 'greater' offense of battery with injury" (*Wilkinson, supra*, 33 Cal.4th at p. 838). We concluded that rational basis review applied to the claim because a defendant " 'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.' " (*Ibid.*) We explained that *Olivas*'s language should not be interpreted so broadly as to require strict scrutiny "whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals." (*Id.* at p. 837.) Indeed, we cautioned that "[a]pplication of the strict scrutiny standard in this context would be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment." (*Id.* at p. 838.)

More recently, in *Hardin, supra*, 15 Cal.5th at page 847, after defendant conceded that the rational basis test applied, we addressed his equal protection challenge to section 3051 similar

to the one defendant makes here. (See *Hardin, supra*, 15 Cal.5th at p. 847.) The defendant in *Hardin* challenged section 3051's disparate treatment of young adults sentenced to LWOP for special circumstance murder and of young adults sentenced to life with the possibility of parole. Applying the rational basis test, we concluded the Legislature acted rationally by singling out special circumstance murder as a particularly culpable offense and making those convicted of that crime ineligible for early release. (*Hardin,* at p. 862.) Consistent with *Hardin*, we apply the deferential rational basis test in resolving defendant's equal protection claim. (See *id.* at p. 847.)

Traditionally, the rational basis test has been described as a two-part inquiry, with courts "first ask[ing] whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner," and then " 'consider[ing] whether the challenged classification' is adequately justified," i.e., whether it " 'bears a rational relationship to a legitimate state purpose.' " (*Hardin, supra*, 15 Cal.5th at p. 848.) However, in *Hardin* we held that "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question." (*Id.* at p. 850.) That holding applies in this case, where the issue presented is whether section 3051(h) violates equal protection "by excluding young adults convicted and sentenced for serious sex crimes under the One Strike law (§ 667.61) from youth offender parole consideration, while young adults convicted of first degree murder are entitled to such consideration." We thus proceed directly to the question

23

whether the unequal treatment bears a rational relationship to a legitimate state purpose.

As in *Hardin*, the following principles guide our analysis of that question: "[W]e presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' [Citation.] The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible — rather than simply rational.' " (*Hardin, supra*, 15 Cal.5th at p. 852.) "[T]his high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*Chatman, supra*, 4 Cal.5th at p. 289.)

This deferential standard also reflects the Legislature's "considerable latitude in defining and setting the consequences of criminal offenses." (*Johnson, supra*, 60 Cal.4th at p. 887.) To that end, " '[w]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an " 'imperfect fit between means and ends' " [citations], or 'because it may be "to some extent both underinclusive and

overinclusive." ' " (*Ibid.*) "Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all' " [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*People v. Barrett* (2012) 54 Cal.4th 1081, 1110 (*Barrett*).)

However, we have cautioned that " 'the realities of the subject matter cannot be completely ignored.' " (*Johnson*, *supra*, 60 Cal.4th at p. 881; see *Heller v. Doe* (1993) 509 U.S. 312, 321 (*Heller*) ["standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation"].) The statutory classification must be rationally related to " 'realistically conceivable legislative purpose[s],' " and may not be based on "invented fictitious purposes that could not have been within the contemplation of the Legislature." (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 163 (*Fein*); see *ibid.* [Legislature reasonably limited noneconomic damages to $250,000 based on "unpredictability of the size of large noneconomic damages awards"].)

## E. Defendant's Equal Protection Claim

Defendant's constitutional challenge to section 3051's One Strike exclusion is premised on (1) the seriousness of a One Strike offense as compared to that of first degree murder, which is not categorically excluded under section 3051, and (2) the recidivism risk of One Strike offenders when compared to other defendants who are not similarly excluded under section 3051, such as habitual sexual offenders. We address each aspect of this argument in turn.

First, defendant maintains that there is no rational basis to exclude One Strike offenders but not those convicted of first degree murder from parole eligibility consideration because the high court made clear in *Graham* that homicide offenses differ "in a moral sense" from nonhomicide offenses in terms of " 'their "severity and irrevocability." ' " (*Graham, supra,* 560 U.S. at p. 69.) Defendant suggests that our decision in *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*), which referred to the high court's observations in *Graham,* presaged the equal protection argument he presses here.

In *Contreras*, we addressed the constitutional implications under the Eighth Amendment of sentencing two juvenile defendants convicted of One Strike offenses to 50-year-to-life terms, which we deemed to be the functional equivalent of LWOP. (*Contreras, supra,* 4 Cal.5th at pp. 371–372.) Because the defendants' One Strike convictions made them statutorily ineligible for a youth offender parole hearing under section 3051 (see § 3051(h)), we concluded that our then recent decision in *Franklin, supra,* 63 Cal.4th 261 — which held that the availability of a section 3051 parole eligibility hearing rendered the defendant's lengthy sentence " 'neither LWOP nor its functional equivalent' " — did not apply. (*Contreras,* at p. 359.) Absent the availability of a section 3051 hearing, we concluded in *Contreras* that the defendants' sentences violated the Eighth Amendment under standards set forth in *Graham.* (*Contreras,* at p. 379.)

As relevant to defendant's equal protection claim here, at the end of our *Contreras* opinion, we noted the defendants' contention that it was "anomalous" to exclude juvenile One Strike offenders from section 3051's purview, while not excluding juvenile offenders convicted of special circumstance

murder and sentenced to LWOP. (*Contreras*, *supra*, 4 Cal.5th at p. 382.) We commented that this exclusion of One Strike offenders "appears at odds" with the high court's statement in *Graham* that nonhomicide offenses are " 'less deserving of the most serious forms of punishment' " than murder, and we also underscored that no other Penal Code provision "treats a nonhomicide offense more harshly than special circumstance murder." (*Contreras*, *supra*, 4 Cal.5th at p. 382.) Notably, we declined to resolve this potential constitutional issue, while suggesting that the "current penal scheme for juveniles may warrant additional legislative attention." (*Ibid*.) We similarly decline to consider the issue or its import in this case, which involves young *adults* and not juveniles, who are "constitutionally different" from adults for purposes of sentencing. (*Miller, supra*, 567 U.S. at p. 471; *Graham, supra*, 560 U.S. at p. 74 [" 'age of 18 is the point where society draws the line for many purposes between childhood and adulthood' "]; *Contreras, supra*, 4 Cal.5th at p. 371 [recognizing high court drew a " 'clear line' " between juveniles and adults].)

Acknowledging that *Graham* and *Miller* are not controlling because they were Eighth Amendment cases dealing with the sentencing of juveniles rather than young adults, defendant nevertheless insists that growing scientific research "has established a sound basis for extending [the] principles" of these cases "to young offenders up to the age of 25." (See *Miller*, *supra*, 567 U.S. at p. 483 ["the principle of *Roper*, *Graham*, and our individualized sentencing cases [is] that youth matters for purposes of meting out the law's most serious punishments"].) Defendant further asserts that our Legislature has already acknowledged such research by expanding section 3051 parole eligibility to include young adults between the ages of 18 to 25

years old. He asks us to similarly hold, based on our Legislature's acknowledgement of this research, that the Legislature is required to treat young adults the same as it treats juveniles for purposes of the equal protection issue now before us. We decline to do so.

Our decision in *Hardin* rejected a similar argument and provides useful guidance in analyzing defendant's claim here. (*Hardin, supra,* 15 Cal.5th at p. 846.) In *Hardin*, the defendant argued that section 3051 violated equal protection because it excluded young adult offenders sentenced to LWOP for special circumstance murder, but not other young adult offenders serving parole-eligible sentences for other crimes. The defendant asserted that when the Legislature decided to extend section 3051's reach of early parole eligibility to young adults, "it could not rationally treat those sentenced to life without the possibility of parole differently from those convicted of other serious crimes and serving lengthy parole-eligible sentences." (*Hardin*, at p. 846.) "Once the Legislature decided to include one class of young adult offenders," the defendant argued, "it was obligated to include both." (*Ibid.*)

Rejecting the defendant's argument, we first explained that the Legislature was under no "constitutional compulsion" to include young adults up to the age of 25 within section 3051's purview, but that it "chose to" do so based on scientific evidence that neurological development "continues beyond adolescence and into the mid-20's." (*Hardin, supra*, 15 Cal.5th at pp. 846, 866.) We next explained that the Legislature, having made that choice, was not thereby constitutionally obligated to treat all such offenders the same, regardless of the severity or nature of their crimes, the degree of culpability those crimes demonstrated, the prospects for rehabilitation, or the sentence

imposed. (*Id.* at pp. 855–858.) In expanding section 3051 to include young adult offenders, the Legislature did not have " 'a single purpose' " in mind (*id.* at p. 853); rather, it "sought to balance" the statute's "primary objective" — "giv[ing] these young persons the opportunity to obtain release based on demonstrated growth and rehabilitation" — "with other, sometimes competing, concerns, including concerns about culpability and the appropriate level of punishment for certain very serious crimes." (*Id.* at p. 854.) "In other words, in designing section 3051, the Legislature consciously drew lines that altered the parole component of offenders' sentences based not only on the age of the offender (and thus the offender's amenability to rehabilitation) but also on the offense and sentence imposed. The lines the Legislature drew necessarily reflect a set of legislative judgments about the nature of punishment that is appropriate for the crime." (*Id.* at p. 855.) Because these "legislative policy choices" are not "irrational," they are not "impermissible as a matter of equal protection." (*Id.* at p. 840.)

Regarding the One Strike exclusion at issue here, we agree with the Attorney General that the Legislature could rationally exclude One Strike offenders from early parole under section 3051 based on a combination of concerns: the increased risk of recidivism that One Strike offenders pose and the aggravated nature of their offenses.[7] It is true that nothing in

---

[7]    The dissent tries to cast these twin concerns as part of an esoteric formulation "(*offense severity* x *recidivism risk*)" designed and "tailor-made to sustain the One Strike exclusion." (Dis. opn. of Liu, J., *post*, at p. 21.) We disagree. These concerns are conventional "penological considerations" that reflect

section 3051's legislative history specifically references the reason for the One Strike exclusion.  But it is well established that an equal protection claim subject to rational basis review does not rise or fall based on whether lawmakers expressly articulated the purpose they sought to achieve with the challenged legislation.  (See *ante*, at p. 24.)  A court conducting such review "may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation] 'whether or not' any such speculation has 'a foundation in the record.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 75 (*Turnage*); see *Heller*, *supra*, 509 U.S. at p. 320 [state need not "produce evidence to sustain the rationality of a statutory classification"].)

For example, in *Hardin*, we identified the rational basis for the LWOP exclusion there at issue — not in any statutory language or legislative history explicitly explaining the reason for the exclusion — but more broadly in the "statutory framework" (*Hardin*, *supra*, 15 Cal.5th at p. 855) embodying "longstanding [legislative] judgments about the seriousness of" the crimes that authorized an LWOP sentence "and, relatedly, the punishment for them" (*id.* at p. 853).  This framework, we reasoned, reflects that the Legislature in enacting section 3051, "aimed to increase opportunities for meaningful release for young adult offenders, while taking into account the appropriate punishment for the underlying crimes, depending on their severity." (*Hardin*, at p. 855.)

So too here, it is not difficult to perceive the basis for the Legislature's exclusion of One Strike offenders, particularly given what is well known about the history of, and motivations

---

"rehabilitative and retributive purposes." (*Hardin, supra*, 15 Cal.5th at p. 857.)

underlying, the enactment and amendment of the One Strike law. Contrary to our dissenting colleague's suggestion (dis. opn. of Liu, J., *post*, at pp. 17–18), because the Legislature expressly incorporated the One Strike law as an exclusion to early parole eligibility under section 3051, the Legislature is presumed to be aware of the concerns addressed by the One Strike law identified not only in its legislative history, including to ensure that dangerous sex offenders who committed their offenses under aggravated circumstances would be subject to lengthy prison terms (see *ante*, at pp. 13–17), but also in decisions interpreting that law (see, e.g., *Wutzke, supra*, 28 Cal.4th at pp. 929–930; *Hammer, supra*, 30 Cal.4th at p. 768). (Cf. *Lorillard v. Pons* (1978) 434 U.S. 575, 581 [when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute"]; see *Williams v. Garcetti* (1993) 5 Cal.4th 561, 572 [we commonly " 'assume that in passing a statute the Legislature acted with full knowledge of the state of the law at the time' "].)

As section 667.61's legislative history discloses, the Legislature had significant concerns regarding recidivism of One Strike offenders and the serious nature of the offenses they commit. As explained, before section 3051's enactment in 2013, the One Strike law's reach was expanded twice: by the electorate's passage of Jessica's Law in 2006 and the Legislature's enactment of Chelsea's Law in 2010. The relevant legislative history expressly identified the nature and seriousness of the triggering offenses in combination with significant recidivism concerns as the reason for these amendments. For instance, the Voter Information Guide on Proposition 83 and Jessica's Law underscored that sex offenders

have "very high recidivism rates," "are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society." (Voter Information Guide on Prop. 83, *supra*, text of Prop. 83, at p. 127; see *ante*, at p. 15.) Likewise, legislative analyses of Chelsea's Law explained that sex offenders who commit "the most serious and heinous sex crimes against children are not able to be rehabilitated" and that these crimes "are a red flag that the perpetrator is capable of much, much worse." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844, as amended Apr. 13, 2010, p. 18.)[8]

The Legislature could rationally conclude, based on its view that a One Strike sex offender's risk of recidivism is high, that rehabilitation is unlikely, and therefore these offenders would not likely be eligible for parole, much less early parole under section 3051. With this understanding, the Legislature crafted section 3051(h), balancing a young adult's capacity for growth and rehabilitation against the set of concerns that had prompted the enactment and amendment of the One Strike law and ultimately deciding that those concerns militate against offering the possibility of early parole under section 3051.

The exclusion of One Strike offenders from section 3051, in other words, reflects a legislative judgment that extending

---

[8] The fact that defendant's victims were not minors does not foreclose a finding that the Legislature had recidivism concerns, both about One Strike offenders generally and in particular those who sexually assaulted children, which provide a rational basis for the One Strike exclusion. "When conducting rational basis review . . . [a] plausible reason for distinguishing between [two groups of individuals] need not exist in *every* scenario in which the statutes might apply." (*Turnage, supra*, 55 Cal.4th at pp. 77–78.)

the possibility of early release to young adult One Strike offenders would be neither productive nor appropriate. Insofar as the One Strike law itself reflects significant concerns about the risk of reoffending, this judgment is consistent with the common sense view that a defendant who reoffends after a prior conviction is "less amenable to rehabilitation than a person who has not done so." (*People v. Towne* (2008) 44 Cal.4th 63, 80.) The judgment that One Strike offenders are less amenable to rehabilitation is necessarily a generalization — perhaps not applicable to every person sentenced under the One Strike law — but it is one the Legislature is entitled to make. (See *Turnage, supra*, 55 Cal.4th at p. 77 ["When conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made"].)

Excluding youthful One Strike offenders from early parole consideration is also consistent with the Legislature's apparent concern with protecting the public from persons who have committed serious sex offenses, given the risk of reoffense. These concerns are "realistically conceivable" and provide a rational basis for section 3051's One Strike exclusion. (*Fein, supra*, 38 Cal.3d at p. 163.) We also underscore that defendant does not point to any evidence that the Legislature had similar recidivism concerns about the class of offenders who commit murder or that the offense of murder necessarily includes aggravating factors like those outlined in section 667.61. We must uphold the Legislature's classification against an equal protection challenge unless "it fairly can be said that there is no 'reasonably conceivable state of facts that could provide a

rational basis for the classification.' " (*Warden v. State Bar*, *supra*, 21 Cal.4th at p. 645.)[9]

We make a final observation about defendant's comparison between a homicide offense and a One Strike offense before we address defendant's argument based on the comparative recidivism rates of groups of offenders. (See *post* at p. 39.) Defendant insists that it is irrational to exclude One Strike offenders but not those convicted of murder from early parole consideration because the high court deemed murder not only fundamentally different "in a moral sense" from other serious offenses, but also incomparable in terms of its " 'severity and irrevocability." ' " (*Graham*, *supra*, 560 U.S. at p. 69.) This argument based on the comparative seriousness of crimes, however, is premised on concerns relevant in the context of Eighth Amendment challenges to the death penalty and other severe criminal penalties, such as juvenile LWOP; such concerns do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis

---

[9]    Contrary to our dissenting colleague's assertion, our holding here is not inconsistent or in tension with our holding in *Hardin*, which dealt with a different exclusion in section 3051(h). (*Hardin*, *supra*, 15 Cal.5th at p. 839; see dis. opn. of Liu, J., *post*, at p. 16.) In *Hardin*, we rejected the premise that " 'there was only a single purpose underlying' section 3051" (*Hardin*, at p. 853), and instead recognized that section 3051, like most legislation, reflected multiple objectives. What is true of section 3051 as a whole is likewise true of its exclusions; there is no reason to suppose that the Legislature crafted each exclusion with precisely identical penological interests in mind. Indeed, we underscored that " 'the equal protection clause does not preclude a . . . legislative measure that is aimed at achieving multiple objectives, even when such objectives in some respects may be in tension or conflict.' " (*Hardin*, at p. 854.)

standard. We acknowledge that section 3051 was crafted to "bring juvenile sentencing in conformity with *Miller*, *Graham* and *Caballero*" (*Franklin*, *supra*, 63 Cal.4th at p. 268), and to that end, Eighth Amendment "protections outlined in *Miller*" are featured in this provision. (*Franklin*, at p. 276.) However, despite "language echoing the holdings of these cases" (*Hardin*, *supra*, 15 Cal.5th at p. 845), this equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile LWOP sentencing.

For instance, the high court recently confirmed that the Eighth Amendment's ban against cruel and unusual punishment " 'has always been considered, and properly so, to be directed at the method or kind of punishment' a government may 'impos[e] for violation of criminal statutes.' " (*City of Grants Pass v. Johnson* (2024) ___ U.S. ___ [144 S.Ct. 2202, 2204].) The Eighth Amendment " 'guarantees individuals the right not to be subjected to excessive sanctions.' " (*Miller*, *supra*, 567 U.S. at p. 469.) "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Graham*, *supra*, 560 U.S. at p. 59.)

With respect to defendants who commit nonhomicide offenses, the high court in *Graham* explained that these defendants are "categorically less deserving of the most serious forms of punishment," and confirmed that they cannot be sentenced to death. (*Graham, supra*, 560 U.S. at p. 69, citing *Kennedy v. Louisiana* (2008) 554 U.S. 407 (*Kennedy*); see *Kennedy*, at p. 446 ["death penalty is not a proportional punishment for the rape of a child"]; *Coker v. Georgia* (1977) 433

U.S. 584, 592 (*Coker*) ["sentence of death is grossly disproportionate and excessive punishment for the crime of rape"].)[10] Defendant argues that he is, therefore, "less deserving of harsh punishment than a young offender who has committed murder."

The comparison is inapt. For one thing, it is not the case that section 3051 and its exclusions categorically result in harsher punishment for youthful One Strike offenders than for youthful offenders who commit murder. As noted, section 3051(h) also excludes from early parole eligibility those young adults who commit special circumstance murder and are sentenced to LWOP instead of death. Additionally, because section 3051 creates a scheme for early parole eligibility, the exclusion of a particular group of offenders from the statute's scope does not necessarily mean they are ineligible for parole at all. Indeed, many offenders sentenced under the One Strike law are already eligible for parole after 15 or 25 years. (§ 667.61, subd. (a).) And One Strike offenders, like defendant, who are not sentenced to LWOP are entitled to elderly parole consideration at the age of 50 if they have served a minimum of 20 years continuously on their current sentence. (§ 3055, subds. (a), (g).) The effects of section 3051(h)'s exclusions are not so categorical as defendant and the dissent posit.

More fundamentally, we conclude that in distinguishing between homicides and nonhomicide offenses in terms of their

---

[10] It extended that reasoning to juveniles, holding that they cannot be sentenced to LWOP, i.e., the "harshest possible penalty for juveniles" for committing nonhomicide offenses (*Miller, supra,* 567 U.S. at p. 489; see *Graham, supra,* 560 U.S. at p. 69), or homicides (*Miller, supra,* 567 U.S. at p. 489), without first giving due consideration to their attributes of youth.

" ' "severity and irrevocability" ' " (*Graham, supra,* 560 U.S. at p. 69, quoting *Kennedy, supra,* 560 U.S. at p. 438), a characterization also used to describe the penalty of death, the high court was outlining the Eighth Amendment's limits on excessive punishments. (*Graham,* at p. 89 [death penalty " 'must be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution" ' "]; *Miller, supra,* 567 U.S. at p. 476 ["death penalty is reserved only for the most culpable defendants committing the most serious offenses"]; see *Gregg v. Georgia* (1976) 428 U.S. 153, 187 ["death as a punishment is unique in its severity and irrevocability"].) Notably, the high court in *Kennedy,* on which *Graham* and *Miller* heavily rely, emphasized the "distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons . . . on the other" for purposes of "*determining whether the death penalty is excessive.*" (*Kennedy, supra,* 554 U.S. at p. 438, italics added; see *ibid.* [the "same distinction between homicide and other serious violent offenses against the individual" is relevant to whether death penalty is disproportionate to vicarious felony murder].) The high court explained: " 'We have the abiding conviction that the death penalty, which "is unique in its severity and irrevocability," is an excessive penalty for the rapist who, as such, does not take human life.' " (*Id.* at pp. 437–438, quoting *Coker, supra,* 433 U.S. at p. 598.)

These statements by the high court that homicide is a more serious crime than a nonhomicide offense must be considered in their proper context, which was whether the death penalty is a proportionate punishment to the crime for purposes of the Eighth Amendment. Contrary to defendant's contention,

the court did not advance the comparison in all other contexts, including for the purpose of evaluating, as a general matter, "the nature of punishment that is appropriate for [each] crime." (*Hardin*, *supra*, 15 Cal.5th at p. 855; see *Coker*, *supra*, 433 U.S. at p. 597 ["We do not discount the seriousness of rape as a crime"].) Put another way, the high court did not hold as a matter of constitutional imperative that "no crime can be punished more severely than homicide." (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1281; see *id.* at p. 1280 [rejecting defendant's claim that his 25-year-to-life sentence for rape in course of burglary (§ 667.61) was cruel and unusual punishment because it was longer than sentence for "more serious" crime of second degree murder].) Therefore, contrary to our dissenting colleague's suggestion (see dis. opn. of Liu, J., *post*, at pp. 14–15), the high court's statements about homicide do not undermine our conclusion that, in enacting section 3051, the Legislature permissibly "exercise[d] its responsibility" "to increase the opportunities for meaningful release for young adult offenders, while taking into account the appropriate punishment for the underlying crimes, depending on their severity." (*Hardin*, *supra*, 15 Cal.5th at p. 855.) The One Strike exclusion is one such result of this exercise.

In addition, we emphasize that, in contrast to a cruel and unusual punishment analysis, the equal protection inquiry asks whether there is a rational basis for the Legislature to treat certain individuals differently when prescribing the consequences under an ameliorative statute like section 3051. "The Equal Protection Clause confers no substantive rights and creates no substantive liberties. The function of the Equal Protection Clause, rather, is simply to measure the validity of classifications created by state laws." (*Rodriguez*, *supra*, 411

U.S. at p. 59 (conc. opn. of Stewart, J.), fn. omitted.) And, as we have explained above, the Legislature had a rational reason to categorically exclude young adult One Strike offenders, but not young adults convicted of non-special-circumstances murder, from early parole consideration under section 3051. (See *ante*, at pp. 32–33.)

Defendant next contends that recidivism is a legitimate concern for the Legislature to address "across the board"; therefore, the inquiry here is not whether recidivism justifies the early parole ineligibility of young adult One Strike offenders. Rather, according to defendant, the question is whether the Legislature may rationally justify the categorical exclusion of One Strike offenders *but not other types of offenders* from youth offender parole hearings. In support of his argument, defendant focuses on offenders sentenced under the habitual sexual offender statute (§ 667.71), who are subject to offenses that may overlap with the One Strike law, but who are not similarly excluded under section 3051(h). (See *People v. Snow* (2003) 105 Cal.App.4th 271, 282 ["one strike law and the habitual sexual offender law continue to be alternative sentencing schemes: a sentence may be imposed under one of the sentencing schemes, but not both"].) In particular, defendant argues that the Legislature's failure to exclude habitual sexual offenders, who are by definition recidivists, demonstrates that recidivism concerns were not a rational basis for the One Strike exclusion. The Attorney General, however, counters that defendant failed to raise this issue below and, therefore, has forfeited the issue.

We need not address the Attorney General's forfeiture argument because we conclude that defendant's argument lacks substantive merit. Contrary to defendant's assertion, the exclusion from parole eligibility of offenders sentenced under

the One Strike law, but not those sentenced pursuant to the habitual sexual offender statute, does not undermine our conclusion that the Legislature was at least partially motivated by concerns of recidivism in enacting the One Strike exclusion. The One Strike law addresses not only a defendant's risk of recidivism but, as important here, the aggravated circumstances of the underlying crime or crimes, the number and nature of which determine the length of a One Strike sentence. (See *ante*, at pp. 14–15.) In contrast to section 667.61, the habitual sexual offender statute's purpose is "to address *solely* recidivism." (*Hammer*, *supra*, 30 Cal.4th at p. 768.) Unlike section 667.61, it is " '*not* to punish especially aggravated instances of a particular crime.' " (*People v. Murphy* (2001) 25 Cal.4th 136, 155.) This difference in purpose between the One Strike law and habitual sexual offender law supports treating those who fall within these provisions differently.

Defendant, however, maintains that the Legislature "arbitrarily" distinguished young adult One Strike offenders from other types of sexual offenders by excluding them from section 3051's purview. He points to "numerous long-term studies and research" on recidivism rates of various offenders which he claims support his assertion that young adult One Strike offenders are not more likely to reoffend than other types of offenders. Our dissenting colleague likewise cites reports published by the California Department of Corrections and Rehabilitation that "find that 'sex offenders consistently recidivate at lower rates than non-sex offenders' " and he posits that "very few" sex offender registrants who reoffend were convicted of a new *sex* crime. (Dis. opn. of Liu, J., *post*, at p. 19.) The Attorney General cites an older study by the California Department of Justice which concluded that " '[s]ex offenders as

a group are highly recidivistic.' " In any event, insofar as there is conflicting or ambiguous evidence regarding the risk of recidivism among sex offenders, the Attorney General counters that pursuant to *Johnson, supra*, 60 Cal.4th at page 881, "the reasoning underlying the Legislature's classification need not ' "be empirically substantiated" ' or have ' " 'a foundation in the record.' " ' "

These studies illustrate the continuing academic and scientific debate on the issue. We do not opine on any study's persuasiveness or question any study's ultimate conclusions. We do note, however, that there is an empirical basis to support the Legislature's recidivism concerns; this would refute any suggestion that the Legislature adopted the One Strike exclusion based solely on a patently false "public perception" that sex offenders recidivate more than other criminals. This further undermines our dissenting colleague's claim that the Legislature's actions were based on an "irrational prejudice" against "an especially despised subset of young offenders" (dis. opn. of Liu, J., *post*, at p. 3), rather than on the Legislature's concerns about public safety.

We acknowledge and agree with the Attorney General that in addressing concerns regarding recidivism, the Legislature may institute reform in an area of law in an "incremental and uneven manner" without having to " 'choose between attacking every aspect of a problem or not attacking the problem at all.' " (*Barrett, supra*, 54 Cal.4th at p. 1110; see *ante*, at pp. 24–25.) Equal protection "does not prohibit the Legislature from regulating certain classes of cases in which the need is deemed most evident." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313 (*Jennings*); see *id*. at pp. 1312–1313 [Evid. Code § 1109 does not violate equal protection by

41

permitting propensity evidence in domestic abuse cases and not in other cases].)  Here, the voters clearly espoused the view that One Strike offenders "are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society." (Voter Information Guide on Prop. 83, *supra*, text of Prop. 83, p. 127.)  We also noted legislative findings that these offenders "cannot be cured of [their] aberrant impulses, and must be separated from society to *prevent reoffense*." (*Wutzke*, *supra*, 28 Cal.4th at pp. 929–930, italics added; see *Acosta*, *supra*, 29 Cal.4th at p. 127 ["purpose of the One Strike law is to provide life sentences for aggravated sex offenders, *even if they do not have prior convictions*"], italics added.)  Against this backdrop, it is feasible that the Legislature adopted a zero tolerance approach — which extends the One Strike law's severe punishment to first time offenses — to reduce recidivism of those sex offenders it deemed particularly dangerous by incapacitating them through long terms of imprisonment.  (*Wutzke,* at p. 931 [§ 667.61 expresses "intolerance toward child sexual abuse"]; see *Graham*, *supra*, 560 U.S. at p. 72 ["Recidivism is a serious risk to public safety, and so incapacitation is an important goal"].)

Although defendant contends that there is no basis for "singling out" young adult One Strike offenders from other types of sex offenders for exclusion under section 3051(h), we agree with the Attorney General that the Legislature could have rationally concluded — as reflected by the relevant amendments to the One Strike law — that One Strike offenders posed an identified recidivism risk of committing aggravated sex offenses and that allowing these offenders who would likely reoffend to seek early parole would be inconsistent with the rehabilitative goal of section 3051.  The aggravating circumstances that

trigger sentencing under the One Strike law provide a rational basis for distinguishing defendants who have also committed one of the specified sex offenses apart from other sex offenders. (See *Wutzke, supra,* 28 Cal.4th at p. 930; see also *ante,* at pp. 14–15.)  In any event, to the extent defendant argues that the One Strike exclusion does not reach those offenders who commit offenses similar to One Strike offenses, we reiterate that under the rational basis test, " 'we must accept any gross generalizations and rough accommodations that the Legislature seems to have made.'  [Citation.]  'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends," ' [citation], or 'because it may be "to some extent both underinclusive and overinclusive." ' " (*Johnson, supra,* 60 Cal.4th at p. 887.)

We conclude that the One Strike exclusion is rationally related to legitimate state interests in addressing recidivism of serious and dangerous sex offenders and setting punishments that are appropriate for the triggering crimes committed under the specified circumstances.  Because a plausible basis exists for the Legislature's differential treatment of One Strike offenders, we may not second-guess whether this decision was wise, fair, or logical.  (*Johnson, supra,* 60 Cal.4th at p. 881.)  This is " 'the very essence of legislative choice.' " (*Hardin, supra,* 15 Cal.5th at p. 854.)  Our conclusion that the Legislature did not act irrationally in excluding One Strike offenders from the youth offender parole statute "does not turn on this court's judgments about what constitutes sound sentencing policy.  It turns on the deference we owe to the policy choices made through the

democratic process by the people of California and their elected representatives." (*Id.* at pp. 839–840.)[11]

Because the Legislature has the prerogative to tackle societal problems "incremental[ly] and uneven[ly]" (*Barrett, supra,* 54 Cal.4th at p. 1110), it is up to the Legislature to determine where "the need is deemed most evident." (*Jennings, supra,* 81 Cal.App.4th at p. 1313; see *ibid.* ["that other crimes such as murder and mayhem may be more serious and that credibility contests are not confined to domestic violence cases do not demonstrate the absence of the required rational basis for the Legislature's distinction between these crimes"].) It is not unreasonable that the Legislature focused on One Strike offenders for exclusion from section 3051 given that it considered such offenders to pose an elevated risk of recidivism and to have committed particularly severe offenses. Thus, we cannot say this classification is "devoid of any conceivable degree of coherent justification" such that it violates equal protection. (*Chatman, supra,* 4 Cal.5th at p. 291.)

---

[11] Our dissenting colleague concedes he "would not hold that the Legislature may never exclude One Strike offenders from youth offender parole eligibility." (Dis. opn. of Liu, J., *post,* at p. 25.) However, he asserts that "as the statute comes to us, the legislative record and relevant policymaking context leave me unable to conclude that the exclusion emanated from a rational policy judgment." (*Ibid.*) Suffice it to say, our court's equal protection jurisprudence neither demands nor permits such a rigorous or searching review of rationality. Indeed, as we have explained (see *ante,* at p. 24), "the underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' " (*Hardin, supra,* 15 Cal.5th at p. 852.)

Nor can we say that this justification has no "footing in the realities of the subject addressed by the legislation." (*Heller*, *supra*, 509 U.S. at p. 32.) As the amendments to the One Strike law reflect, the Legislature and electorate sought to address the recidivism concerns wrought by One Strike offenders, adding that an ancillary goal was to eliminate the availability of early parole for these offenders. (See, e.g., Voter Information Guide on Prop. 83, *supra*, argument in favor of Prop. 83, at p. 46 [Prop. 83 would "[r]equire dangerous sex offenders to *serve their entire sentence* and not be released early for any reason"].) In light of this purpose of the One Strike law, it is reasonable that the Legislature excluded those offenders it considered serious and dangerous from seeking early release under section 3051 even though they committed the controlling offense as young adults below the age of 26.

## CONCLUSION

In sum, we conclude that the Legislature may reasonably have found that One Strike offenders pose an increased risk of recidivism and that the aggravated nature of their offenses diminishes their prospects for rehabilitation. Such concerns are sufficient to justify the Legislature's decision to make One Strike offenders categorically ineligible for youth offender parole consideration under section 3051(h). In creating a mechanism for youth offenders to be considered for early release under section 3051, the Legislature rationally chose not to extend that opportunity to young adult One Strike offenders like defendant, whom it considered the most likely to reoffend and the least likely to rehabilitate. Therefore, whether considered an as-applied or facial challenge, defendant's equal protection claim fails.

45

We reiterate that "[i]t is not for us to pass judgment on the wisdom or desirability of [the Legislature's] policy choices." (*Hardin, supra,* 15 Cal.5th at p. 864.)  Our task is "limited" (*id.* at p. 866) to determining whether the Legislature's decision to exclude One Strike young adult offenders but not young adults convicted of murder from youth offender parole hearings under section 3051 violates equal protection under a rational basis test.  We conclude that it does not.[12]

### DISPOSITION

We affirm the Court of Appeal's judgment, but remand the matter to the Court of Appeal with directions to determine whether to consider any briefing on defendant's entitlement to the benefit of any ameliorative legislation enacted during the pendency of his appeal before this court.

**JENKINS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**SMITH, J.**[*]

---

[12]  We disapprove *People v. Edwards, supra,* 34 Cal.App.5th 183 and *In re Woods* (2021) 62 Cal.App.5th 740, to the extent they are inconsistent with this opinion.

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. WILLIAMS

S262229


Dissenting Opinion by Justice Liu


Defendant Jeremiah Williams is serving a sentence beyond his life expectancy for sex offenses he committed when he was 24 years old.  The Legislature, recognizing that brain development affecting judgment and decision-making is still ongoing in young adults, enacted the youth offender parole statute to account for "the diminished culpability of youth." (Pen. Code, § 3051, subd. (f)(1); all undesignated statutory references are to this code.)  The statute is intended to provide a parole mechanism "in accordance with" key precedents limiting punishment for youth offenders, including *Miller v. Alabama* (2012) 567 U.S. 460, 473 (*Miller*), which explained that the attributes of youth are not "crime-specific."  (Stats. 2013, ch. 312, § 1.)  Despite this stated intent and Williams's age at the time of his offenses, he is not eligible for a youth offender parole hearing because he was sentenced under the One Strike law.  (§ 667.61; see § 3051, subd. (h).)  The question is whether the Legislature had a rational basis for excluding young adult One Strike offenders from a parole scheme that gives other young adult offenders, including many convicted of murder, a meaningful opportunity for release.

From a certain point of view, this might be considered an easy question.  No one disputes that the aggravated sex offenses covered by the One Strike law, including the crimes Williams committed, are abhorrent and deserve harsh punishment.  Sex crimes evoke public outrage, disgust, and condemnation.  And

1

sex offenders are surely among the most despised groups in our society. One might think it is perfectly rational for the Legislature to give effect to these public attitudes by excluding One Strike offenders like Williams from the youth offender parole scheme.

But the rational basis test in equal protection doctrine does not deem it "rational" for the Legislature to simply act on public fears or perceptions. Under rational basis review, a law that disadvantages a particular group cannot be justified on the basis of "mere negative attitudes," "fear [that is] unsubstantiated," or "irrational prejudice" directed against that group. (*City of Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 448, 450 (*Cleburne*); see *Parr v. Municipal Court* (1971) 3 Cal.3d 861, 865 (*Parr*).) A challenged classification must instead serve a legitimate public purpose and reflect a rational policy judgment.

Whether the One Strike exclusion reflects such rationality does not appear to be an easy question, judging from the length of today's opinion. In my view, the court's labored effort to rationalize the One Strike exclusion does not bear fruit. The problem begins — and largely ends — with the Legislature's express recognition that young adult offenders, whatever their crime, have diminished culpability and are capable of growth and rehabilitation. The Legislature made clear its intent to create a parole scheme in accordance with that insight. That being the case, how was it rational for the Legislature to exclude One Strike offenders from youth offender parole eligibility? The court hypothesizes a rationale that fuses concerns about the aggravated nature of One Strike offenses with concerns about recidivism. As I explain below, this hypothesis does not withstand scrutiny and does not dispel the genuine risk that the

One Strike exclusion has more to do with irrational prejudice than rational policy judgment.

The defendant in this case stands convicted of heinous crimes, and public hostility toward sex offenders is palpable in the history of the One Strike law. (See maj. opn., *ante*, at pp. 13–17.) But public hostility, the court agrees, does not itself supply a rational basis for the Legislature to exclude One Strike offenders from youth offender parole eligibility. Equal protection of the laws requires more. As the statute comes to us, there is nothing more that shows the Legislature properly discharged its "duty to govern impartially" (*Cleburne, supra*, 473 U.S. at p. 452 (conc. opn. of Stevens, J.)) when it excluded an especially despised subset of young offenders from the parole scheme. I respectfully dissent.

## I.

As the court acknowledges (maj. opn., *ante*, at p. 25), equal protection analysis "must find some footing in the realities of the subject addressed by the legislation." (*Heller v. Doe* (1993) 509 U.S. 312, 321; see *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) So I begin with some realities of which we must take cognizance in order to conduct an appropriate analysis in this case.

There can be no dispute that the crimes covered by the One Strike law, including those committed by Williams, are serious, violent, and deserving of strict punishment. "Along with other forms of sexual assault, rape belongs to that class of crimes against the person that can never adequately be redressed. It is the quintessential 'violation of the self' [citation], the ultimate affront to the dignity of the human spirit. As such, it is an offense against all humanity." (*People v.*

*Escobar* (1992) 3 Cal.4th 740, 743.)  Rape "is widely viewed as the most atrocious of intrusions upon the privacy and dignity of the victim; never is the crime committed accidentally; rarely can it be said to be unpremeditated; often the victim suffers serious physical injury; the psychological impact can often be as great as the physical consequences; in a real sense, the threat of both types of injury is always present."  (*Furman v. Georgia* (1972) 408 U.S. 238, 458–459 (dis. opn. of Powell, J.).)

Although many crimes against persons involve severe injury and gross violations of personal autonomy, sex crimes are regarded as particularly depraved, "frequently inspiring extreme negative emotional reactions, such as disgust, fear, and moral outrage."  (Olver & Barlow, *Public Attitudes Toward Sex Offenders and Their Relationship to Personality Traits and Demographic Characteristics* (2010) 28 Behavioral Science & L. 832; *ibid.* ["Sex offenders tend to be a particularly reviled group of individuals in the public eye . . . .  This is particularly well exemplified by disparaging terms that abound in the media such as 'predator,' 'monster,' or 'psychopath.' "].)  In one study, 50 California residents were interviewed regarding their attitudes toward "sexually violent predators" (SVPs).  (Williams, *Constructing Hysteria:  Legal Signals as Producers of Siting Conflicts Over Sexually Violent Predator Placements* (2018) 43 L. & Social Inquiry 706, 706, 711–713.)  Some of the participants compared SVPs to "wild animals" and "pit bulls that repeatedly attack people."  (*Id.* at p. 720.)  Others "perceived fundamental flaws in SVPs' biological makeup," describing "the problem with SVPs as 'something in their DNA,' 'something [that] short-circuited in their brain,' and as having 'arrested development' and 'a sickness.' "  (*Ibid.*)  In short, "sex offenders are one of the most disfavored groups in our society."

(*Gundy v. United States* (2019) 588 U.S. 128, 172 (dis. opn. of Gorsuch, J.).)

The point is echoed by many commentators. (See Klein & Cooper, *Punitive Attitudes Toward Sex Offenders: Do Moral Panics Cause Community Members to Be More Punitive?* (2019) 30(6) Crim. J. Policy Review 948, 952 [collecting studies showing that "[s]ex offenders are often considered some of the most hated and feared criminal offenders" and a "commonly vilified population"]; Fox, *Incurable Sex Offenders, Lousy Judges & the Media: Moral Panic Sustenance in the Age of New Media* (2012) 38 Am. J. Crim. J. 160, 161 [observing that sex offenders are characterized as " 'folk devils' " in the media]; Farkas & Miller, *Sex Offender Treatment: Reconciling Criminal Justice Priorities and Therapeutic Goals* (2008) 21(2) Fed. Sentencing Rep. 78, 79 (Farkas & Miller) [sex offenders "are viewed by society with repugnance"]; O'Hear, *Perpetual Panic* (2008) 21 Fed. Sentencing Rep. 69, 71 [observing the public perception that "sex offenders are uniquely dangerous"]; Geraghty, *Challenging the Banishment of Registered Sex Offenders from the State of Georgia: A Practitioner's Perspective* (2007) 42 Harv. Civ. Rights-Civ. Liberties L.Rev. 513, 514 ["Sex offenders are arguably the most despised members of our society"]; Logan, *Liberty Interests in the Preventative State: Procedural Due Process and Sex Offender Community Notification Laws* (1999) 89(4) J. Crim. L. & Criminology 1167 ["Sex offenders are the scourge of modern America"].)

Public outrage is especially intense with regard to sex crimes against minors (though Williams's crimes did not involve minors). (See Rosselli & Jeglic, *Factors Impacting upon Attitudes Toward Sex Offenders: The Role of Conservatism and Knowledge* (2017) 24(4) Psychiatry, Psychology & L., 496, 499

(Rosselli & Jeglic) ["[A]lthough public fear about sex offenders is generally high, the highest level of fear is directed toward those who offend against children."]; Kernsmith et al., *Public Attitudes Toward Sexual Offenders and Sex Offender Registration* (2009) 18 J. Child Sexual Abuse 290, 295 [out of seven categories of sexual offenders, people most feared those whose offenses were against minors].) In barring the death penalty as punishment for rape of a child, the high court said "we have no confidence that the imposition of the death penalty would not be so arbitrary as to be 'freakis[h]' " because the "context" of such a case "involves a crime that in many cases will overwhelm a decent person's judgment." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 439.)

Such fear and outrage are reflected in the history of Jessica's Law (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006), eff. Nov. 8, 2006) and Chelsea's Law (Stats. 2010, ch. 219, § 1, eff. Sept. 9, 2010), both of which toughened the One Strike law in the wake of highly publicized offenses against children. (Maj. opn., *ante*, at pp. 15–17.) The legislative history of Chelsea's Law said, " 'The violent sexual predator that attacks children is a particular type of evil and should be treated as such.' " (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1844, as amended April 13, 2010, p. 14.) The law's author said, " '[T]hose [who] have committed the most serious and heinous sex crimes against children are not able to be rehabilitated.' " (*Id.* at p. 13; see also Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127 [sex offenders "are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society"].)

At the same time, it has been shown that public revulsion toward sex offenders and ensuing legislative responses "may be

based upon myths and misperceptions about sex offenders, such as the notion that sex offenders have very high recidivism rates and that strangers commit most sex crimes." (Rosselli & Jeglic, *supra*, at p. 496.) A 2010 survey by the United States Department of Justice, with over 1,000 respondents "presumed to be largely representative of community members," found that "the public believes sexual reoffense rates are markedly higher" than they actually are. (Center for Sex Offender Management, U.S. Dept. of Justice, Exploring Public Awareness and Attitudes about Sex Offender Management: Findings from a National Public Opinion Poll (2010) pp. 1–2 (U.S. Dept. of Justice).) Consistent with these findings, the Attorney General in this case acknowledges that "[t]he Legislature's actions in this area were presumably informed by the widespread 'public perception' that 'recidivism is a more serious problem among sex offenders than other criminals,' " even as the sources he cites show that this perception is out of proportion with reality. (See Ahluwalia, *Civil Commitment of Sexually Violent Predators: The Search for a Limiting Principle* (2006) 4 Cardozo Pub. L. Policy & Ethics J. 489, 494 (Ahluwalia) ["The notion that sex offenders are a class of offenders with unusually high rates of recidivism is one that has great political and emotional appeal, but little empirical substantiation."]; Comment, *Examining Sex Offender Community Notification Laws* (1995) 83 Cal. L.Rev. 885, 897–898 ["Despite studies indicating low recidivism rates, the public continues to perceive, as it has for decades, that the threat from sex offenders is greater than it actually is."]; see also Farkas & Miller, *supra*, at p. 78 ["Despite the reality that the rates of recidivism for sex offenders are actually lower than most commonly thought, sex offenders are still perceived as a high-risk type of offender."]; Socia & Harris, *Evaluating Public*

*Perceptions of the Risk Presented by Registered Sex Offenders: Evidence of Crime Control Theater?* (2016) 22(4) Psych. Pub. Pol. & L., 375, 378–380 [nationally representative survey of 1,000 adults showed that respondents significantly overestimated the percentage of sex offenders who were strangers to their victims and their likelihood of recidivism].)

In the United States Department of Justice study, "the clear majority of respondents (74%) reported that the news media was the predominant source from which they received most of their information and knowledge about sex offenders." (U.S. Dept. of Justice, *supra*, at p. 2.) The study observed: "Media portrayals of sex crimes and the individuals who commit these offenses are not always grounded in current statistics, research, and accurate information which, in turn, can create perceptions, expectations, and demands for public policies that may not be well informed and which may not result in the desired outcomes. Indeed, many sex offender-specific laws have been developed in reaction to individual cases that generate attention and debate at state and national levels, and which often involve the abduction, sexual assault, and murder of children committed by repeat sex offenders who were not known to the victims or their families." (*Ibid.*, fn. omitted.) "Those specific crimes statistically represent only a very small fraction of all sex crimes and other violent crimes that come to the attention of the authorities, and the victim-offender relationship is not typical of most sex offenses. Nonetheless, such cases often serve as a catalyst for sweeping legislative reforms . . . ." (*Ibid.*, fn. omitted.)

The California Sex Offender Management Board has made similar findings. The Board was created in 2006 "to provide the Governor, the State Legislature and relevant state

and local agencies with an assessment of current sex offender management practices and recommended areas of improvement." (Cal. Sex Offender Management Board, Recommendations Rep. (Jan. 2010) p. 7 (CASOMB); see, e.g., Assem. Com. on Appropriations, Analysis of Assem. Bill No. 1844 (2009–2010 Reg. Sess.) May 19, 2010, p. 9 [discussing the Board's 2010 report in the legislative history of Chelsea's Law].) The Board's membership reflects, "to the extent possible, representation of northern, central, and southern California, as well as both urban and rural areas," and consists of members from government and nongovernment agencies, including the Office of the Attorney General, California Department of Corrections and Rehabilitation, California Department of State Hospitals, criminal defense attorneys, and two recognized experts in the field of sexual assault. (§ 9001, subds. (a) & (b).) The Board in 2010 summarized the policymaking context as follows: "Sexual crimes rightly outrage communities. The legacy of sexual assault in the lives of victims is often profound and long-lasting. In the aftermath of an assault, communities often demand with great vehemence that policymakers and public safety professionals DO SOMETHING. The root of the desire to acknowledge the serious nature of the crime is difficult to disparage but, when combined with fear, misinformation and the heat of media inquiry, the flame of community outrage can create a political environment that rewards swift action over more methodical, effective approaches. On occasion, these swift approaches may address short-term community outrage at the cost of directing resources and skilled personnel away from investments in strategies for long-term safety." (CASOMB, at pp. 8–9.)

## II.

I mention this context not to suggest that this court should opine on how dangerous sex offenders are or what punishment they deserve. That is not our role in deciding the equal protection issue before us. The Legislature has wide latitude in defining crimes and punishments, and may appropriately give expression to the public's strong condemnation of certain crimes and its desire for retribution, although that latitude is bounded by "the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense'" (*Kennedy v. Louisiana, supra*, 554 U.S. at p. 419; see *id.* at p. 421 [prohibiting death penalty for rape of a child victim under Eighth Amendment]; *Coker v. Georgia* (1977) 433 U.S. 584 [same holding for rape of an adult victim]) and by the principle that a juvenile offender's "capacity for change and limited moral culpability" limit the range of permissible punishment even for the worst crimes (*Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*); see *id.* at p. 82 [prohibiting life imprisonment without parole (LWOP) for juvenile nonhomicide offenders]; *Miller, supra*, 567 U.S. 460 [prohibiting mandatory LWOP for juvenile homicide offenders]; *Roper v. Simmons* (2005) 543 U.S. 551 [prohibiting death penalty for crimes committed by juveniles]).

The One Strike law imposes harsh punishments for certain aggravated sex offenses (maj. opn., *ante*, at pp. 14–17), and its constitutionality is not at issue here. This case concerns section 3051, the youth offender parole statute. The question is not whether One Strike offenders between the ages of 18 and 25 have a freestanding constitutional right to parole eligibility. The question is whether the Legislature, having created a parole eligibility scheme premised on youth offenders' diminished

culpability and capacity for rehabilitation, had a rational basis for excluding One Strike offenders from the scheme. In answering that question, we must consider the nature of the group affected and the real risk, given the group affected here, that the exclusion reflects "irrational prejudice" (*Cleburne*, *supra*, 473 U.S. at p. 450) or "irrational fears" (*id.* at p. 455 (conc. opn. of Stevens, J.). (See *id.* at p. 448 (maj. opn.) ["[T]he [government] may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic. 'Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.' "].)

In enacting the youth offender parole statute in 2013, the Legislature stated its purpose in the law's opening provision: "The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 [(*Caballero*)] and the decisions of the United States Supreme Court in [*Graham*] and [*Miller*]." (Stats. 2013, ch. 312, § 1.)

Soon after, in light of more " '[r]ecent scientific evidence on adolescent and young adult development and neuroscience show[ing] that certain areas of the brain — particularly those affecting judgment and decision-making — do not fully develop

11

until the early- to mid-20s' " (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 261 (2015–2016 Reg. Sess.) Apr. 28, 2015, p. 3), the Legislature amended the parole eligibility scheme to include adults who committed crimes before the age of 23 (Stats. 2015, ch. 471, § 1) and then to include adults who committed crimes before age 26 (Stats. 2017, ch. 675, § 1). A committee report on the latter bill states: "The rationale, as expressed by the author and supporters of this bill, is that research shows that cognitive brain development continues into the early 20s or later. The parts of the brain that are still developing during this process affect judgment and decision-making, and are highly relevant to criminal behavior and culpability. (See Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, Journal of Adolescent Health (Sept. 2009); National Institute of Mental Health, *The Teen Brain: Still Under Construction* (2011).) 'The development and maturation of the prefrontal cortex occurs primarily during adolescence and is fully accomplished at the age of 25 years. The development of the prefrontal cortex is very important for complex behavioral performance, as this region of the brain helps accomplish executive brain functions.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.) Sept. 4, 2017, pp. 4–5, quoting Arain et al., *Maturation of the Adolescent Brain* (2013) 9 Neuropsychiatric Disease & Treatment 449.)

As this court said in *People v. Hardin* (2024) 15 Cal.5th 834, 845 (*Hardin*), "The Legislature enacted section 3051 to bring California juvenile sentencing law into line with *Graham*, *Miller*, and *Caballero*." The Legislature subsequently expanded the parole scheme to 18- to 25-year-olds based on the same observations about diminished culpability and capacity for

maturation that apply to juveniles. (*Id.* at pp. 845–846.) Here, as in *Hardin*, "there is no dispute that the scientific evidence cited by the Legislature [in enacting and expanding section 3051] applies to young offenders across the board. Nothing about the 'distinctive (and transitory) mental traits and environmental vulnerabilities' of youth offenders 'is crime-specific' (*Miller*, *supra*, 567 U.S. at p. 473), and the Legislature nowhere suggested that young offenders who commit certain crimes . . . are immune to those vulnerabilities or incapable of reform. There is also no dispute that providing young offenders with a meaningful opportunity for release in light of their capacity for change is the only purpose stated by the Legislature in creating and expanding the parole scheme. No other purpose is stated in the statute or legislative history." (*Id.* at p. 881 (dis. opn. of Liu, J.).)

In *Hardin*, we addressed a different exclusion from the youth offender parole scheme. The question was whether the Legislature had a rational basis for excluding 18- to 25-year-olds convicted of special circumstance murder and sentenced to LWOP. In upholding the exclusion, the court said "[i]t may be true, as Hardin argues, that [the statute's] crime-based categories" for differentiating between eligible and ineligible defendants (and among eligible defendants as to timing of eligibility) "are not rationally related to the Legislature's purpose of expanding opportunities for early release based on the attributes of youth since, as *Miller* explained, the attributes of youth are not 'crime-specific.' (*Miller*, *supra*, 567 U.S. at p. 473.) No doubt the Legislature — which consciously enacted section 3051 in language that borrowed from *Miller* and other Eighth Amendment juvenile sentencing cases — was aware of this point." (*Hardin*, *supra*, 15 Cal.5th at p. 855.) The court

nonetheless posited, based on the statute's repeated use of crime-based categories, that "the Legislature sought to balance [its] primary objective" of providing "young persons the opportunity to obtain release based on demonstrated growth and rehabilitation" with "competing . . . concerns about culpability and the appropriate level of punishment for certain very serious crimes." (*Id.* at p. 854; see *id.* at p. 855 ["The statutory framework indicates that the Legislature aimed to increase opportunities for meaningful release for young adult offenders, while taking into account the appropriate punishment for the underlying crimes, depending on their severity."].)

Notably, today's opinion does not uphold the One Strike exclusion based on *Hardin*'s reasoning. The court does not posit, as it did with regard to the exclusion of young offenders sentenced to LWOP for special circumstance murder, that the exclusion of One Strike offenders reflects a "legislative judgment[]" that a competing interest in "appropriate punishment" for their crimes outweighs the Legislature's stated interest in providing young offenders a meaningful opportunity for release in light of the non-" 'crime-specific' " attributes of youth. (*Hardin, supra*, 15 Cal.5th at p. 855.) This is no surprise because such reasoning would run headlong into the high court's statement in *Graham* that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. [Citations.] There is a line 'between homicide and other serious violent offenses against the individual.' [Citation.] Serious nonhomicide crimes 'may be devastating in their harm . . . but "in terms of moral depravity and of the injury to the person and to the public," . . . they cannot be compared to

murder in their "severity and irrevocability." ' " (*Graham*, *supra*, 560 U.S. at p. 69; see Stats. 2013, ch. 312, § 1 ["The purpose of this act is to establish a parole eligibility mechanism . . . in accordance with . . . *Graham* . . . ."].) Rationalizing the One Strike exclusion on the basis of offense severity would suggest that One Strike offenses, which (as this case illustrates) often result in a de facto LWOP sentence, are as deserving of punishment as special circumstance murder and more deserving than simple first degree murder, a crime that does not result in ineligibility for youth offender parole (§§ 190, subd. (a), 3051, subd. (b)(3)) — all of which would defy what *Graham* plainly said.

The court attempts to minimize *Graham*'s statement that nonhomicide offenses are "categorically less deserving" of punishment than murder by saying the statement must be considered in the context of "whether the death penalty is a proportionate punishment to the crime for purposes of the Eighth Amendment." (Maj. opn., *ante*, at p. 37.) But *Graham* was a case about whether LWOP, not the death penalty, is a permissible punishment for nonhomicide offenses committed by juveniles. In *Graham* itself, the quoted statement had relevance beyond the death penalty (*Graham*, *supra*, 560 U.S. at pp. 69–70 [discussing LWOP]), and it is equally relevant here, where the issue concerns parole eligibility for a defendant who is otherwise serving de facto LWOP and who, the Legislature has found, possesses the same youth-related traits as juveniles. Further, today's opinion says that *Graham*'s statement about "the comparative seriousness of crimes . . . is premised on concerns relevant in the context of Eighth Amendment challenges . . . ; such concerns do not necessarily establish whether a Legislature's classification violates equal protection

under a rational basis standard." (Maj. opn., *ante*, at pp. 34–35.) But why not? As the court acknowledges, "section 3051 was crafted to 'bring juvenile sentencing in conformity with *Miller*, *Graham*, and *Caballero.*'" (*Ibid.*) Surely one indicator of irrationality in a parole eligibility scheme — especially a scheme expressly intended to conform to Eighth Amendment jurisprudence and to extend the same principles to young adults — is the treatment of different offenses without regard to proportionality concerns.

Realizing that *Hardin*'s thesis about offense severity cannot supply a rational basis for the One Strike exclusion, the court hypothesizes that the Legislature "could rationally conclude, based on its view that a One Strike sex offender's risk of recidivism is high, that rehabilitation is unlikely, and therefore these offenders would not likely be eligible for parole, much less early parole under section 3051." (Maj. opn., *ante*, at p. 32.) But didn't this court just say in *Hardin*, six months ago, that section 3051's "*crime-based categories are not rationally related to the Legislature's purpose of expanding opportunities for early release based on the attributes of youth since, as* Miller *explained, the attributes of youth are not 'crime-specific.'* (*Miller*, *supra*, 567 U.S. at p. 473.) *No doubt the Legislature — which consciously enacted section 3051 in language that borrowed from* Miller *and other Eighth Amendment juvenile sentencing cases — was aware of this point*"? (*Hardin*, *supra*, 15 Cal.5th at p. 855, italics added; see also *Graham*, *supra*, 560 U.S. at p. 73 ["'incorrigibility is inconsistent with youth'"].) Today's opinion now suggests the Legislature rejected *Miller*'s statement that the attributes of youth are not "crime-specific" and instead believed that the capacity of youth offenders for maturation and

rehabilitation does not apply to young adult One Strike offenders. Well, which is it?

The answer is straightforward from section 3051's express statement of purpose and its legislative history, which "consciously" endorsed *Miller* and *Graham* (*Hardin*, *supra*, 15 Cal.5th at p. 855) and highlighted the reduced culpability and natural capacity for change of young offenders across the board. (*Ante*, at pp. 11–12.) Nothing in the statute's findings, statement of purpose, or "framework" (*Hardin*, at p. 855) suggests that One Strike offenders, unlike other young adult offenders, are incapable of change. And "nothing in section 3051's legislative history specifically references the reason for the One Strike exclusion." (Maj. opn., *ante*, at pp. 29–30.)

Finding no support in the text or legislative history of section 3051 for the theory that the One Strike exclusion reflects rational concerns about recidivism, today's opinion purports to identify such support in the history of the One Strike law. (Maj. opn., *ante*, at pp. 30–33.) The court cites various assertions in the Voter Guide on Proposition 83 (Jessica's Law) and the legislative history of Chelsea's Law (e.g., maj. opn., *ante*, at pp. 31–32 ["sex offenders have 'very high recidivism rates' [and] 'are the least likely to be cured and the most likely to reoffend' "]; *id.* at p. 32 ["sex offenders who commit 'the most serious and heinous sex crimes against children are not able to be rehabilitated' "]), and posits that the Legislature, in enacting the youth offender parole scheme, had those same concerns (*id.* at pp. 32–33).

As an initial matter, it is rather unorthodox to ascribe to the Legislature that enacted and expanded the youth offender parole scheme from 2013 to 2017 the beliefs of the voters who

enacted Jessica's Law in 2006 or the views of the Legislature that enacted Chelsea's Law in 2010.  Because the Legislature's membership, knowledge base, and priorities can change over time, a statute's meaning "must be closely related to the time and circumstance of its use."  (*United States v. Stewart* (1940) 311 U.S. 60, 69.)  It is especially unconvincing to impute the views of the electorate that amended the One Strike law in 2006 to an entirely different legislative body (i.e., the Legislature that enacted the youth offender parole statute seven years later), particularly when that legislative body was considering a distinct subset of offenders (i.e., youth offenders) with unique attributes.

The Legislature that enacted section 3051 did not refer to the legislative history of the One Strike law, and it is telling that the Legislature said nothing at all about its reason for the One Strike exclusion.  The California Sex Offender Management Board, the state's official authority on sex offenders, had observed in a 2010 report that "[p]olicy makers have insufficient resources for obtaining reliable information about recidivism nor do they have ready access to expert assistance in interpreting the complex recidivism data available from multiple sources."  (CASOMB, *supra*, at p. 77.)  The Board also reported that "[n]o information is available at this time regarding sexual recidivism for sex offenders on probation in California."  (*Ibid.*)  And while the Attorney General says "[s]tudies in the 1980s" demonstrated that " '[s]ex offenders as a group are highly recidivistic,' " he acknowledges that more recent studies have shown that this "commonly held belief . . . is not supported by the evidence."  (Lave, *Arizona's Sex Offender Laws:  Recommendations for Reform* (2020) 52 Ariz. State L.J.

925, 926, citing Ahluwalia, *supra*, 4 Cardozo Pub. L. Policy & Ethics J. at p. 494.)

More recently, the California Department of Corrections and Rehabilitation (CDCR) has published reports on the reconviction rates of individuals released from California prisons, including those released on parole. Although the reports track reconviction rates for only a three-year period following release, they provide the only comprehensive California-specific data available, and they find that "sex offenders consistently recidivate at lower rates than non-sex offenders." (CDCR, Recidivism Rep. for Individuals Released from the Cal. Dept. of Corrections and Rehabilitation in Fiscal Year 2017–18 (2023) p. 26 (2017–2018 CDCR Report); see *ibid.* ["According to historical data, the conviction rate for sex registrants is regularly at least 15 percentage points lower than the rate for non-sex registrants"]; CDCR, Recidivism Rep. for Individuals Released from the Cal. Dept. of Corrections and Rehabilitation in Fiscal Year 2018–19 (2024) p. 23 (2018–2019 CDCR Report) [same]; CDCR, Recidivism Report for Individuals Released from the Cal. Dept. of Corrections and Rehabilitation in Fiscal Year 2011–12 (2017) p. 33 (2011–2012 CDCR Report) [same].)

This pattern holds for persons released after serving sentences for the most serious sex offenses. For example, the three-year reconviction rates for *any* crime, not necessarily a sex crime, among persons released in 2017–2018 whose commitment offense was penetration with an object (11.9%), rape (10.3%), or lewd act with a child (7.1%) were far lower than the rates among persons whose commitment offense was residential burglary (48.7%), assault with a deadly weapon (43.4%), arson (42.0%), or robbery (41.6%). (2017–2018 CDCR

Report, at pp. 39–40.)  Moreover, the vast majority of sex registrants who were reconvicted were convicted of a non-sex crime or failure to register; very few were convicted of a new sex crime.  (See 2011–2012 CDCR Report, at p. 35 [2.2% of reconvicted sex registrants were convicted of a felony sex crime and 1.0% were convicted of a misdemeanor sex crime]; 2017–2018 CDCR Report, at p. 26 [4.8% and 1.5%, respectively]; 2018–2019 CDCR Report, at p. 23 [5.2% and 2.7%, respectively].)

Whether or not the Legislature was aware of such data, I mention them to rebut the court's casual assertion that the Legislature, in enacting and expanding the youth offender parole scheme from 2013 to 2017, could rationally have been concerned about recidivism among One Strike offenders despite its express recognition of the non-crime-specific capacity of young offenders to mature and rehabilitate.  If, contrary to the fundamental premise of the youth offender parole scheme, recidivism was the Legislature's concern, it is not clear why the Legislature would have singled out One Strike offenders for exclusion over other types of offenders.  It is especially unclear why the Legislature did not exclude persons sentenced under the Habitual Sexual Offender law (§ 667.71), which "target[s] only recidivist sexual offenders" (*People v. Hammer* (2003) 30 Cal.4th 756, 768).  Such an exclusion would be "consistent with the common sense view that a defendant who reoffends after a prior conviction is 'less amenable to rehabilitation than a person who has not done so.' "  (Maj. opn., *ante*, at p. 33.)

The court's ultimate contention is that the One Strike exclusion reflects the Legislature's concern not for offense severity alone and not for recidivism risk alone, but instead for an amalgam of those two concerns.  (See maj. opn., *ante*, at p. 40

[distinguishing Habitual Sexual Offender law on the ground that "[t]he One Strike law addresses not only a defendant's risk of recidivism but, as important here, the aggravated circumstances of the underlying crime"]; *id.* at p. 45 ["In sum, we conclude that the Legislature may reasonably have found that One Strike offenders pose an increased risk of recidivism and that the aggravated nature of their offenses diminishes their prospects for rehabilitation."].) This amalgam fares no better than its individual components as a basis for the One Strike exclusion.

The court seems to posit that the Legislature applied some kind of (*offense severity* x *recidivism risk*) calculus that yields a judgment of ineligibility for young One Strike offenders. This approach might have some plausibility were it not for the fact that it appears tailor-made to sustain the One Strike exclusion, with no discernible application to the vast range of other offenses covered by the parole scheme. As noted, the CDCR studies observe that persons convicted of first degree burglary, robbery, arson, or assault with a deadly weapon tend to recidivate at much higher rates than persons convicted of rape. (See 2018–2019 CDCR Report, at p. 36; 2017–2018 CDCR Report, at p. 39.) Many of those offenses are "serious" and "violent" felonies under our sentencing laws. (§§ 667.5, subd. (c), 1192.7, subd. (c); see *People v. Cruz* (1996) 13 Cal.4th 764, 772–773 [voters who enacted section 1192.7 believed residential burglaries "are so inherently dangerous that persons who repeatedly commit this type of offense should be punished as harshly as violent recidivists"]; see also *Graham, supra,* 560 U.S. at p. 69 ["an offense like robbery or rape is 'a serious crime deserving serious punishment' "].) Given the comparatively high rates of reconviction among those who have committed

serious and violent non-sex crimes against persons, is it realistically conceivable that the Legislature applied an (*offense severity* x *recidivism risk*) calculus so exquisitely calibrated that it produced an answer of "ineligible" for One Strike offenders and no others?

In *Hardin*, this court inferred from the Legislature's use of numerous "crime-based distinctions" throughout the "statutory framework" that it sought to balance parole eligibility with considerations of offense severity and appropriate punishment. (*Hardin*, *supra*, 15 Cal.5th at pp. 854–855.) Here, apart from the One Strike exclusion itself, the court points to nothing in section 3051 or its legislative history suggesting that an (*offense severity* x *recidivism risk*) calculus informed the Legislature's crafting of the youth offender parole scheme. To my mind, the single-use nature of this hypothesized rationale makes it less than plausible. (See *Hays v. Wood* (1979) 25 Cal.3d 772, 790 (*Hays*) [holding that, under an "application of the equal protection provisions of our state Constitution," the " 'underinclusive' aspect" of the law at issue could not be justified on the ground that "a legislative body, in addressing a particular problem area, need not attack all phases at once"].)

## III.

I conclude with a few words about the court's treatment of the standard of review. In reaching today's holding, the court recites and applies the most deferential formulations of rational basis review: " 'The underlying rationale for a statutory classification need not have been "ever actually articulated" by lawmakers, nor "be empirically substantiated." ' " (Maj. opn., *ante*, at p. 24.) "A court . . . 'may engage in " 'rational speculation' " as to the justifications for the legislative choice . . .

"whether or not" any such speculation has "a foundation in the record." ' " (*Id.* at p. 30.) " ' "[W]e must accept any gross generalizations and rough accommodations that the Legislature seems to have made." ' " (*Id.* at pp. 24, 33, 43.) The state need not " ' "choose between attacking every aspect of a problem or not attacking the problem at all." ' " (*Id.* at pp. 25, 41.)

As I explained at length in *Hardin*, these formulations originated in federal equal protection cases addressing economic legislation (see *Hardin*, *supra*, 15 Cal.5th at p. 876 (dis. opn. of Liu, J.) [discussing *Warden v. State Bar* (1999) 21 Cal.4th 628 (*Warden*) and its reliance on *United States Railroad Retirement Board v. Fritz* (1980) 449 U.S. 166, *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, and *Williamson v. Lee Optical* (1955) 348 U.S. 483 (*Lee Optical*)]), and the court's recitation of these principles "ignores the considerable variation and nuance in our case law applying rational basis review" (*id.* at p. 867; see *id.* at pp. 868–879 [extensively reviewing our case law on rational basis review].) "[T]his court's articulation and application of rational basis review has not marched in lock step with federal authority. Our approach is deferential but far from toothless; our case law, though not entirely uniform, reveals several recurring themes: [We have required] ' "a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals" ' [(*Newland v. Board of Governors* (1977) 19 Cal.3d 705, 711)], [and] we have focused on actual legislative purposes instead of imputing hypothetical ones, and we have looked for empirical support instead of relying on conjecture or unsubstantiated assertions. Although we 'do not require absolute precision in the designation of classifications,' we also 'do not tolerate classifications which are so grossly overinclusive as to defy notions of fairness or

23

reasonableness.' [(*Brown v. Merlo* (1973) 8 Cal.3d 855, 877.)] And while the Legislature may proceed incrementally, we have said it must do so rationally in light of the legislative objectives and 'not . . . wholly at its whim.' (*Hays*, *supra*, 25 Cal.3d at p. 790.)" (*Id.* at p. 879 (dis. opn. of Liu, J.).)

" '[A] serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals' " (*Newland v. Board of Governors*, *supra*, 19 Cal.3d at p. 711) is especially warranted where, as here, there is a genuine risk that a legislative classification reflects irrational fears or prejudice rather than a rational policy judgment. (See CASOMB, *supra*, at pp. 8–9.) No "rigorous or searching review" (maj. opn., *ante*, at p. 44, fn. 11) is needed to account for "the realities of the subject addressed by the legislation." (*Heller v. Doe*, *supra*, 509 U.S. at p. 321.) Yet today's opinion overlooks the realities of the policymaking context with regard to aggravated sex offenses in its uncritical application of equal protection standards derived from cases involving economic legislation. The reality is that opticians are not a reviled group. (See *Lee Optical*, *supra*, 348 U.S. 48.) Nor are satellite master antenna television operators. (See *FCC v. Beach Communications, Inc.*, *supra*, 508 U.S. 307.) Nor are attorneys seeking exemption from continuing education requirements. (See maj. opn., *ante*, at pp. 33–34 [citing *Warden*].) But One Strike offenders most certainly are, as the strongly worded fears and condemnations in the law's history make clear.

In every equal protection case, the appropriate degree of vigilance requires consideration of what group is affected and whether, from the standpoint of "an impartial lawmaker" (*Cleburne*, *supra*, 473 U.S. at p. 452 (conc. opn. of Stevens, J.)), the classification serves a legitimate public purpose and

rationally targets that group for disparate treatment in light of that purpose. In enacting and expanding the youth offender parole scheme, the Legislature said much about the reduced culpability of young offenders and their capacity for growth and rehabilitation, and it said nothing about the reason for excluding One Strike offenders from eligibility. In the face of this silence, hypothesized concerns about offense severity, recidivism risk, or a combination of both do not rationally explain the exclusion. It strikes me as particularly dubious to ascribe recidivism concerns to the Legislature that enacted section 3051 — especially because, as the Attorney General concedes, public perceptions lack support in current evidence, and because the Legislature "consciously" anchored the parole scheme in high court precedent observing that the attributes of youth are not " 'crime-specific' " (*Hardin*, *supra*, 15 Cal.5th at p. 855, quoting *Miller*, *supra*, 567 U.S. at p. 473) and then buttressed that premise with its own findings regarding brain development in young adults (*ante*, at pp. 11–12 [citing legislative history]). To be clear, I would not hold that the Legislature may never exclude One Strike offenders from youth offender parole eligibility. But as the statute comes to us, the legislative record and relevant policymaking context leave me unable to conclude that the exclusion emanated from a rational policy judgment. (Cf. *United States Steel Corp. v. Public Utilities Com.* (1981) 29 Cal.3d 603, 614; *Parr*, *supra*, 3 Cal.3d at pp. 873–874 (dis. opn. of Burke, J.).)

In light of today's decision and *Hardin*, I am concerned that our equal protection jurisprudence is evolving in a manner that ignores Justice Mosk's prescient warnings decades ago. "One feature that distinguishes our equal protection doctrine from its federal counterpart is that the standards of review

25

under our doctrine are limited to two: rational basis review and strict scrutiny. (See *In re Marriage Cases* (2008) 43 Cal.4th 757, 832.) Unlike the federal courts, we have declined to adopt intermediate scrutiny as a third standard of review. (See *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 595–603 (conc. opn. of Mosk, J.); *id.* at pp. 607–610 (conc. opn. of Bird, C. J.).) This means that rational basis review, in our doctrine, covers a wide range of cases and must be applied with nuance and sensitivity if we are to avoid the 'rigidity of [a] two-tiered framework' that 'applies either a standard that is virtually always met [rational basis] or one that is almost never satisfied [strict scrutiny].' (*Id.* at p. 598 (conc. opn. of Mosk, J.).)" (*Hardin, supra,* 15 Cal.5th at p. 868 (dis. opn. of Liu, J.).)

Something is awry when the level of vigilance we apply to a law that exempts certain members of the bar but not others from continuing education requirements (*Warden, supra,* 21 Cal.4th 628) is also what we apply to a law that gives young offenders a meaningful opportunity to avoid life imprisonment but denies that opportunity to an especially despised subset. Our case law applying rational basis review has not always been so rigid. (*Hardin, supra,* 15 Cal.5th at pp. 868–879 (dis. opn. of Liu, J.).) Yet today's decision does not account for the relevant policymaking context and falls short of its own demand that the " 'standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation.' " (Maj. opn., *ante,* at p. 25.)

I respectfully dissent.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Williams

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 47 Cal.App.5th 475
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S262229
**Date Filed:** August 29, 2024

_____

**Court:** Superior
**County:** San Diego
**Judge:** Kenneth K. So

_____

**Counsel:**

Nancy J. King and Rebecca P. Jones, under appointments by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Joshua Patashnik, Deputy State Solicitor General, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

Richard J. Sachs, retired Deputy District Attorney (San Diego), and Gregory D. Totten for the California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Rebecca P. Jones
Attorney at Law
3549 Camino del Rio South, Suite D
San Diego, CA 92108
(619) 549-2392

Joshua Patashnik
Deputy State Solicitor General
600 West Broadway, Suite 1800
San Diego, CA 9201
(619) 738-9628